STATE OF IOWA v. JOSEPH HASSAN and SOLOMON HASSAN, Appellants.

**Criminal law:** SEARCH AND SEIZURE: INSPECTION OF PROPERTY: CONSTITUTIONAL LAW. Upon the arrest of a party it becomes the duty of the officer to take and care for property which he then has in his possession, and no complaint by the accused can be made on the ground of unreasonable search and seizure, even though the

property of itself or when considered with other circumstances carries with it some evidence of guilt. And a refusal to allow the accused an inspection of the property taken from him and introduced before the grand jury is not a deprivation of any constitutional right, where no sufficient showing of the necessity for its production is made.

**Same:** DISMISSAL OF INDICTMENT: RESUBMISSION OF CAUSE: CUSTODY OF DEFENDANT. Where a defendant has moved to set aside the indictment, for the reason that the grand jury which returned it was not legally constituted, he can not complain of an order setting it aside for the same reason, which was subsequently entered on the motion of the county attorney: Nor can he complain of an order directing that he be retained in custody and that his case be resubmitted to another grand jury.

**Same.** A defendant accused of crime has no vested right in any particular grand jury list; and even though the jury returning an indictment was erroneously discharged, the indictment set aside and the case resubmitted to another jury, it was harmless error.

**Same:** SELECTION AND DRAWING OF GRAND JURY: TECHNICAL ERRORS. Such technical defects in the manner of selecting and drawing a grand jury as failure of the notice to the board of supervisors to name the number of grand jurors to be drawn, failure to serve the notice on the board or failure to record the list of grand jurors selected by the board, will be disregarded as unsubstantial and without prejudice; as substantial compliance with the law in this respect is all that is required.

**Same:** EXAMINATION OF JURORS. Where there is nothing to justify the inquiry of a juror as to what he would do in the event that the county attorney should insist upon an indictment the court properly sustained an objection thereto.

**Same:** CHANGE OF VENUE: DISCRETION. Where, as in this case, there was a substantial conflict in the showing made in support of an application for change of venue on the ground of public prejudice, the court in its discretion was justified in denying the application.

**Jurors:** QUALIFICATION: CHALLENGE. Although it appears that a juror may have formed an opinion regarding the defendant's guilt or innocence from what he had heard or read, and still has that opinion at the time of his examination, yet if it appears from his examination that he can and will, if accepted, try the case solely upon the evidence and will render an impartial decision regardless of such opinion, the court in its discretion may, as in this case, properly overrule the challenge.

**Appeal:** ARGUMENT. The bare statement on appeal that the court erred in overruling an objection to certain evidence will be dis-

regarded, because in no manner complying with the rules relating to argument, and for that reason the point will be deemed waived.

**Evidence:** HEARSAY: *Res gestae*. For the purpose of fixing the time of a conversation a witness may state that he heard another person say that the conversation took place at a certain time, if the statement by the other was made at or so near the time of the conversation as to be explanatory thereof. But even though the admission of such evidence may have been erroneous it was not prejudicial in this case, for the other party as a witness stated that the conversation took place at that time.

**Criminal law:** MURDER: EVIDENCE. Where, as on this prosecution for murder, a garment introduced in evidence was identified as the one worn by defendant when arrested, and its identity down to the time of trial was established, it was properly received in evidence and no constitutional right of the defendant was violated thereby.

**Same.** Where there was evidence that the skull of deceased was crushed by a blunt instrument, the admission in evidence of a ball bat found on the highway leading to the place where the body of deceased was found, and testimony that there were stains of human blood upon it was proper, it also being shown that one of the defendants had the same or a similar ball bat in his possession a few days prior to the murder.

**Same.** Evidence that there were frozen horse tracks in the ground near where the body of deceased was found, and that shoes taken from the horses of one of defendants corresponded to and fitted in the tracks, was admissible, although several days had elapsed between the murder and the fitting of the shoes in the tracks; the weight of the evidence in view of the weather and proven condition of the tracks being for the jury.

**Same.** A witness may state that certain tracks were those of horses, although in the nature of a conclusion; as no adequate description can be given.

**Same:** MEMORANDA. The use of memoranda made by a witness at the time the horse shoes were fitted in the tracks was permissible for the purpose of refreshing his memory.

**Same:** CLOTHING. Possession of a coat, upon which there were blood stains, by one of defendants three days after the murder was sufficient to authorize its admission in evidence, although there was no direct evidence that the coat was worn by him at the time of the murder; the weight and value of the evidence being for the jury to determine.

**Instructions:** ALIBI: CIRCUMSTANTIAL EVIDENCE. The instructions in

this case relative to a reasonable doubt as to whether defendants were present when the crime was committed, and as to the weight which should be given circumstantial evidence, are set out in the opinion and held to correctly state the rule in each case.

**Same:** DUTY OF JURORS. Where the jury, as in the instant case, was properly instructed as to reasonable doubt and as to the various matters relied upon by defendants, and was also properly instructed as to the character of circumstantial evidence necessary to a conviction, the further instruction that the jury in its consideration of the case should not make any distinction between their judgment as jurors and their judgment as men, while there may be some question as to its propriety, is held not to constitute reversible error.

**Murder:** EVIDENCE: SUFFICIENCY. The evidence in this action is reviewed and held sufficient to support conviction for murder in the second degree.

*Appeal from Crawford District Court.*—HON. F. M. POWERS, Judge.

THURSDAY, DECEMBER 15, 1910.

DEFENDANTS were jointly indicted for the crime of murder in the first degree. They were each convicted of murder in the second degree, and appeal.—*Affirmed.*

*Conner & Lally,* for appellants.

*H. W. Byers,* Attorney General, *Chas. W. Lyon,* Assistant Attorney General, and *P. J. Klinker,* County Attorney, for the State.

DEEMER, C. J.—Defendants are Assyrian peddlers, and are accused of having killed and murdered one of their countrymen, Fred Nawful by name, who it is said was their cousin, in Crawford County, Iowa, on or about January 5, 1907. They were first indicted by a Crawford County grand jury on the 8th day of February, 1907, and on the 12th of that month they appeared by attorneys,

and moved to quash the said indictment because the grand jury which found it was illegally drawn and impaneled. Their motion was overruled, and the case was continued until the next term of court, and on the first day of that term the county attorney moved to set aside the grand and petit jurors drawn for the year 1907, and on the next day to set aside the indictment returned against the defendants for the reason that the grand jurors which found it had been illegally selected, drawn, and impaneled. These motions were each sustained, and defendants herein were held in custody to await the action of a new grand jury. To this latter action defendants excepted. On April 9th the board of supervisors selected a new grand jury list under the provisions of chapter 12, Acts 32d General Assembly, and a new grand jury was impaneled to which it was proposed to resubmit defendants' case. Defendants interposed a challenge to the new panel because improperly selected and drawn, because the prior grand jury was illegally and unlawfully set aside, because they had theretofore been indicted by a legal grand jury, and because the present grand jury was not a lawful or legal one. This challenge was sustained, and under the provisions of the Code before quoted the court ordered the board of supervisors to reconvene and select a new list of grand and petit jurors. This order was complied with, and the persons so selected appeared and a new grand jury was drawn. To this panel defendants also interposed a challenge based upon practically the same grounds as the challenge to the former panel save that it was also contended that the court was in error in sustaining the previous challenge and in ordering new lists drawn by the board of supervisors. Various other technical defects were urged against the order for the last drawing and in the selection of the last-named grand jury. This challenge was overruled. Seven men were then called into the box, and one of these men was challenged individually, and counsel sought to examine

him as to his qualifications. To certain questions propounded the state objected, and the objections were sustained. The persons called were then selected as a grand jury and defendants' case was resubmitted to them. On April 17th this grand jury returned the indictment upon which defendants were tried, the charge being identical with that made in the first indictment. On September 10th following defendants filed a petition for change of venue. This petition was overruled and defendants excepted. The case went to trial before a jury on September 16, 1907, resulting in the verdict hitherto stated. Counsel for appellants have filed a so-called brief of one hundred and twenty-nine pages, which does not comply with our rules; but which points out something like one hundred and twelve alleged errors on the part of the trial court. These are iterated and reiterated many times, sometimes without argument and sometimes with it, and but for the nature of the case we should feel disposed to disregard this "brief" entirely. However, the nature of the offense is such that we shall consider such points argued in that part of the argument called "brief" as are deemed important or controlling.

I. On February 12th defendants filed a motion for leave to inspect certain exhibits introduced before the grand jury in which it was alleged that certain merchandise belonging to defendants had been taken

1. CRIMINAL LAW: search and seizure: inspection of property: constitutional law.

from them without their authority at the time of their arrest, that they were denied the right of access thereto, and that without examination they could not properly prepare their defense. This motion was overruled and exception taken. This proposition is argued upon the theory that the overruling of the motion deprived defendants of some constitutional right; the thought being, as we understand it, that the taking of the goods constituted an unreasonable search and seizure, and that thereby and by reason

of the ruling, denying them access to the goods, they were deprived of their liberty without due process of law. *State v. Height,* 117 Iowa, 650, and *Boyd v. U. S.,* 116 U. S. 616 (6 Sup. Ct. 523, 29 L. Ed. 746), are cited in support of the proposition. Neither case is in point. When defendants were arrested, it was the duty of the sheriff to take and care for their property, and if perchance any ·of the property so taken in itself or when considered with other circumstances bore some evidence of defendants' guilt it was their misfortune. No unreasonable search or seizure was shown, nor were defendants deprived of any constitutional right. The trial court did not abuse its discretion in denying the motion. The indictment which was then pending against defendants was afterwards dismissed, and the motion was not renewed after the indictment on which the case was tried was returned. Again, there was no such showing regarding the necessity for the production of the property as would justify us in interfering with the order.

II.   Complaint is made of the refusal to set aside the indictment on which the case was tried and of all the preliminary matters from the time of defendants' arrest down to the time the trial was commenced.

2. SAME: dismissal of indictment: resubmission of cause: custody of defendant.

It is said that the court erred in setting aside the first indictment for the reason that the grand jury which found it was a legally constituted body; that the trial court erred in setting aside the two grand jury panels; and erred in holding defendants, and in resubmitting the case to the subsequent grand jury. It will be remembered that defendants moved to quash the first indictment, and that their motion was overruled and exception taken. Thereafter the county attorney, on his own motion, had the list of grand jurors selected for the year 1907 set aside on the same grounds as were insisted upon by defendants as a ground for quashing the indictment, and the county attorney also dismissed the

first indictment, and defendants were ordered held in custody until their case could be submitted to another grand jury.  Against these proceedings defendants protested; but as they had already challenged the indictment on the same grounds, and had excepted to the ruling of the trial court denying their motion, they are in no position to complain of the action of the county attorney.

Defendants challenged the second grand jury, and their challenge was sustained.  Of this they can not of course complain.  When the last grand jury was called they again interposed a challenge, based upon the ground that they had already been indicted by a legal grand jury, that the county attorney illegally dismissed the prior indictment, and that the third grand jury was an illegal body.  They also made many objections to the method of the selection and drawing of the last grand jury.  Among these are certain alleged irregularities of the county auditor and the board of supervisors.  We have already seen that defendants are in no position to complain of the discharge of the first or second grand juries.  And the order holding them in custody and ordering their case resubmitted to the last grand jury was clearly correct and in accord with the usual practice in such cases.

But even were this not true, and the trial court was in error in discharging the first grand jury and setting aside the indictment, defendants suffered no prejudice. 3. SAME.  They had no vested right in any particular jury list, and their attack upon the order discharging the first grand jury and dismissing the indictment is purely collateral.  *State v. Disbrow,* 130 Iowa, 19; *State v. Hart,* 67 Iowa, 142; *State v. Hughes,* 58 Iowa, 165.

The propositions relied upon with reference to the manner of selecting and drawing the last grand jury are purely technical and without merit.  Indeed they are not argued in defendants' brief.  Substantial compliance with

the law is all that is required in such cases. *State v.*

*Edgerton,* 100 Iowa, 63; *State v. Pierce,*

4. SAME: selection and drawing of grand jury: technical errors.

90 Iowa, 506. Such technical defects as failure to name the number of grand jurors to be drawn in the notice to the board of supervisors; failure to serve notice upon the board; failure to record the list of grand jurors selected by the board, and in the call of the board—will be disregarded as unsubstantial and without prejudice.

The questions propounded to an individual grand juror as ground of challenge were improper. The questions asked related to what the juror would do in the event the county attorney should insist upon

5. SAME: examination of jurors.

an indictment. There was nothing to justify such questions. Nothing was asked regarding his qualifications to sit in the case, and the court did not abuse its discretion in sustaining an objecton to the questions asked.

III. The application for change of venue was in the usual form and was supported by the affidavit of twenty-eight people. The state filed counter affidavits signed by thirty-one affiants. The ground for the

6. SAME: change of venue: discretion.

change was prejudice on the part of the people. The trial court, in view of the showing made, which, as may well be imagined, was conflicting, did not abuse its discretion in denying the petition for a change of venue. *State v. Hale,* 65 Iowa, 575; *State v. Miner,* 107 Iowa, 656; *State v. Icenbice,* 126 Iowa, 16.

IV. One Lingberg was called as a trial juror, and examined as to his qualifications. It appeared that the juror had formed an opinion from what he had heard and read as to defendants' guilt or innocence,

7. JURORS: qualification: challenge.

and that he still had that opinion. The juror also testified as follows: "I think I could try this case from the evidence alone and render a fair and impartial verdict regardless of the opinion that

I have already formed. My opinion would not prevent me from trying this case alone on the evidence and render a fair and impartial verdict. If accepted as a juror I will do so. I do not believe that the opinion that I have will enter into my deliberations. · I can tell when I hear the evidence. I can try this case upon evidence alone, and reach a fair and impartial decision regardless of any opinion that I have formed previous to this time or have now." Under the rule announced in *State v. Ormiston,* 66 Iowa, 143; *State v. Ralston,* 139 Iowa, 44; *State v. Rohn,* 140 Iowa, 640, and other like cases, there was no error in overruling the challenge to the juror. The ruling was discretionary in any event, and no abuse of that discretion appears. *State v. Smith,* 124 Iowa, 334; *State v. Brown,* 130 Iowa, 57. The juror did not sit on the trial of the case, but as defendant exhausted all of his peremptory challenges doubtless the error, had there been one, would have been ground for a reversal.

V. Coming now to the trial, we find a great many propositions argued in this manner. "The action of the court in overruling the objection made by defendant to the question propounded by the state to Klinker as to the conditions of the coat was illegal." (Point for reversal No. 25). It is needless to say that this is no argument at all. Turning back to the point referred to we find a statement that the court erred in overruling an objection to a certain question, setting it out, and referring to a page of the abstract, in this particular instance 78. Manifestly this in no manner complies with our rules, and we can not be expected to go from an alleged argument back to a certain point, and from there to a certain page of an abstract in order to discover what the record is, and then to determine whether or not there be some reason for reversing the trial court in its ruling. In this particular instance, as in countless others, there is no argu-

8. APPEAL: argument.

ment whatever, and in such cases we must regard the point, if there be one, waived.

Some of the questions arising upon the trial are briefly argued, and to such as are deemed of interest we now turn our attention.

In order to fix a time when a witness heard defendants talking with his brother, witness was permitted to state that he heard his brother say it was two o'clock in the morning. It does not appear when the brother made the remark. If at the time of the transaction or so near as to be explanatory of the time, the testimony, although hearsay, was admissible as part of the transaction. The brother was a witness and testified that the time was two o'clock, so that no prejudice resulted in any event.

*9. Evidence: hearsay: res gestae.*

A coat which was taken from defendant Joseph Hassan was introduced in evidence and testimony was also given with reference to human blood stains found thereon. It is claimed that there is no testimony that the coat upon which the blood stains were found was ever worn by either of defendants and that if this be not true that the coat was obtained from defendant Joseph in such a way as that it should not have been introduced in evidence against him. There was sufficient identity of the coat as the one had by defendant when arrested, and its identity down to the time of trial was established. The county attorney asked defendant for the coat, and defendant gave it to him without any objection or protest. In view of this record there is nothing of which defendants or either of them may complain. No constitutional right of the defendants was violated. *State v. Van Tassel,* 103 Iowa, 6; *Commonwealth v. Acton,* 165 Mass. 11 (42 N. E. 329); *Adams v. People,* 192 U. S. 585 (24 Sup. Ct. 372, 48 L. Ed. 575).

*10. Criminal Law: murder: evidence.*

VI. A ball bat was found under or near a bridge in a highway leading from the place where the body was

found to the town of Denison.    This bat was found the
next morning after the murder lying on the
ice in the stream which the bridge crossed.

11. SAME.

The bat was introduced in evidence, and testimony of
experts was offered to show that there was human blood
upon it.  · There was testimony tending to show that the
skull of the deceased was fractured and that the identical
bat had been in the possession of one of the defendants
but a few days before the murder.    The identity of the
bat was shown, and there was no error in admitting any
of the testimony with reference thereto.    Even though
the identification were not perfect, this question and also
the effect of the use made of the instrument after it was
found in obliterating or accounting for the blood stains,
were questions for the jury.    Moreover, one of the defend-
ants admitted, during the trial, that he had this bat before
the murder, and he gave a rather strange explanation of
how it left his possession.    His account of this matter was
rather effectually demolished by witnesses for the state;
at least the jury was authorized to so find.

Some complaint is made of rulings on the cross
examination of the expert witness who tested the stains
on the coat and bat for human blood.    No prejudice ap-
pears in these rulings.    The cross examination was full
and extended, and no abuse of discretion is shown.

The sheriff of the county was produced to testify as
to a conversation in the county jail with defendant Joseph
Hassan in the presence of the county attorney.    It is claimed
that this testimony tended to show incriminatory admis-
sions by the defendant, and that the statements are not
shown to have been voluntary.    In this counsel are in
error.    There was testimony showing the voluntary char-
acter of these statements.

Near the place where the dead body was found certain
horse tracks were seen in the frozen ground.    A short time

thereafter the horseshoes were removed from the feet of
Joseph Hassan's horses, taken to the field
12. SAME.        where the tracks were seen and fitted thereto,
and according to the testimony they fitted
exactly.   Defendants objected to this testimony because
the time between the finding of the body and the fitting
of the shoes was so long that the testimony should not have
been admitted.   The crime was committed on January 5th,
and the shoes were fitted on the 15th, and there was
testimony as to the condition of the tracks on the 5th and
the 15th.   The testimony was clearly admissible; its weight
in view of weather and other conditions being for the jury.

A witness was permitted to testify that certain tracks
near the scene of the murder were horseshoe tracks.   Al-
though in the nature of a conclusion, it was nevertheless
a fact to which a witness might testify.   No
13. SAME.        adequate description of the tracks could be
given, and it was permissible for a competent witness to
state what the tracks were.   This is hornbook law.

A witness who was present when the shoes were fitted
to the tracks made a memorandum of what was done at
or very near the time, and was permitted to use this in
14. SAME:        giving his testimony.   In this there was no
memoranda.        error.   Many other complaints are made re-
garding rulings on testimony with reference to these horse-
shoe tracks.   They all relate largely to the weight and value
of the testimony rather than to its competency and need
not be further considered.

Lack of testimony identifying the coat which was
taken from Joe Hassan is insisted upon.   This, too, was
a question for the jury under the record before us.
15. SAME:        Whether or not it was one worn by defend-
clothing.        ant Joseph Hassan on the night of the kill-
ing could only be established by circumstances, for there
were no eyewitnesses.   Defendant had this coat when ar-
rested three days after the murder, and this, as we think,

was sufficient to justify its admission in evidence. So much for rulings on testimony.

VII. Defendants asked fifty-three instructions, each of which was refused, and each refusal is said to have been erroneous. Few, if any, of these propositions are really argued. The trial court gave forty-two instructions, and most of these are challenged in a general way. It is manifest that we can not consider each and all of these and confine the opinion to any reasonable limits. The substance of most of the instructions asked was given by the court in its charge. Others announced incorrect rules of law and were properly refused. We shall not set them out as to do so would unduly extend this opinion. A few of the instructions given will be noticed. Instructions twenty-four, twenty-seven, and twenty-eight read in this wise:

16. INSTRUC-
TIONS: alibi:
circumstantial
evidence.

No. 24. . . . If, in view of all the evidence, you have a reasonable doubt as to whether defendants were in some other place when the crime was committed, you should give the defendants the benefit of the doubt, and find them not guilty. The defendants are not required to prove an alibi beyond a reasonable doubt to entitle them to an acquittal. It is sufficient if the evidence raises a reasonable doubt of their presence at the time of the commission of the crime charged.

No. 27. You are instructed that circumstantial evidence is to be regarded by the jury in all cases, and is many times quite as conclusive in its convincing power as direct and positive evidence of eyewitnesses. When it is strong and satisfactory, the jury should so consider it, neither enlarging or belittling its force; it should have its just and fair weight with you; and if, when it is all taken as a whole, and fairly and candidly weighed, it convinces the guarded judgment, you should convict, and on such conviction you are not to fancy situations or circumstances which do not appear in the evidence, but you are to make those just and reasonable inferences from circumstances proven, which the guarded judgment of a reasonable man would ordinarily make under like circumstances. You

are not artificial beings, governed by artificial or finespun rules, but you should bring to the consideration of the evidence before you, your everyday common sense and judgment as reasonable men, and those just and reasonable inferences and deductions which you, as men, would ordinarily draw from facts and circumstances proven in the case you should draw and act on as jurors.

No. 28.   You are not to make any distinction between your judgment as jurors and your judgment as men; nor can you say as jurors you have any reasonable doubt of that of which as men you have no such doubt.   You should bring to your consideration of the evidence before you, your everyday common sense and judgment as reasonable men, and, from the facts and circumstances which you find to have been proven in the case, make the same reasonable inferences and deductions as jurors which as honest and intelligent men you would make therefrom.   Your position as jurors does not require you to adopt new or artificial methods of logic or reasoning in reaching your verdict, but it does require that you act with the care, caution, and impartiality of honest men, acting under a solemn oath in the discharge of an important duty.

Instruction 24 is undoubtedly correct, and counsel simply say it does not correctly state the rule as to an alibi.   Such a statement is no argument, and needs no further elaboration.   It is said that 27 is an argument in favor of circumstantial evidence and should not have been given.   There is no merit in this claim.

The only doubt in the case, in this connection, is the correctness of No. 28.   A somewhat similar instruction was disapproved in *State v. Ruby,* 61 Iowa, 86. But it will be noticed that there was no 17. Same. duty of jurors. instruction in that case which in any way modified the charge as set out in the opinion. In *State* v. *Collins,* 20 Iowa, 85, we said of such an instruction:

At the instance of the state the court instructed as follows:   'All evidence is, more or less, circumstantial,

the difference being in the degree, and it is sufficient for the purpose when it excludes disbelief—that is, actual, and not technical, disbelief; for he who is to pass on the question is not at liberty to disbelieve as a juror, while he believes as a man.   It is enough that his conscience is clear.'

This is an isolated extract from an opinion by Chief Justice Gibson, in *Commonwealth v. Harman*, 4 Pa. 269. The forcible expression is characteristic of that distinguished jurist.   The opinion from which it is taken discusses at length the nature of circumstantial evidence, and the quantum of proof requisite in criminal cases to justify a conviction.   In the opinion in which it occurs the above extract would not mislead the jury.   But the detached fragment embodied in the instruction above quoted, we can not but believe to be of dangerous tendency; particularly the expression that a person 'is not at liberty to disbelieve as a juror while he believes as a man.' We all believe facts as men, when we would not believe them and act upon them as jurors.   The idea sought to be conveyed is that a juror is not an artificial being, whose judgment is to be governed by technical and artificial rules, but that he is a man, and should, while acting as a juror, act as a man, exercising his reason, his intelligence, his everyday judgment and his common sense.   In this sense, the proposition that if one believes as a man he should also believe as a juror is correct, provided that belief be founded upon and produced by the evidence in the case, and by nothing else, and is so strong, clear and satisfactory as to exclude all reasonable doubt.

If the guilt of the defendant had been fully and undeniably established, if the verdict upon the evidence were satisfactory, we might not have interfered with the judgment in consequence of the giving of the instruction under consideration.   The instruction, as given, was, without explanation, calculated to mislead the jury.

Speaking to the same point the court said, in *State v. Pratt*, 20 Iowa, 267 :

The third instruction given at the request of the state (the exception to which raises the last question meriting our attention) is, in substance, the same as the one dis-

cussed in the fourth division of the opinion in the case of *State v. Collins, supra.* The law, as thus stated, was held to have a dangerous tendency, being calculated without explanation to mislead the jury. It was, however, expressly announced in that case that the giving of such instruction would not justify such a reversal if the guilt of the prisoner had been fully and undeniably established. And the reversal of that case was not based upon this misleading instruction, but upon other and more vital errors, as the opinion will most abundantly demonstrate. And in this case, where all of the instructions seem to have fairly presented the law; where the prisoner has apparently had a careful examination of his case upon its merits; and where the testimony, as he presents it in the bill of exceptions, prepared at his own instance, fully warranted the verdict—we can not consistently, with our duty to look at the substantial rights of the parties, and order such judgment on the record as the law demands, do otherwise than refuse, for this error, to reverse the case.

Such an instruction as here given was approved in *Spies v. People,* 122 Ill. 1 (12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320), and *Nevling v. Com.,* 98 Pa. 322. It was inferentially at least approved in *State v. Tyler,* 122 Iowa, 125. In the instant case the jury was properly instructed as to reasonable doubt and as to the various matters relied upon by defendants, as, for instance, an alibi and good character. They were also properly instructed as to the character of circumstantial evidence necessary to a conviction. Instruction thirty which reads as follows, should also be considered in this connection:

No. 30. The court instructs the jury in this case the law raises no presumption against the defendants, but every presumption of the law is in favor of their innocence, and in order to convict them of the crime charged in the indictment, or any lesser crime included in it, every material fact necessary to constitute such crime must be proved beyond a reasonable doubt, and if the jury entertain any reasonable doubt upon any single fact or element necessary

to constitute the crime, it is your duty to give the prisoners the benefit of such doubt and acquit them.

None of the cases relied upon by appellants' counsel go to the extent of condemning such an instruction as was here given, and we are not justified in reversing the case on account of the language used. Additional cases from other states might be cited in support of the instruction; but those referred to seem all sufficient. We are not to be understood as commending this instruction even as given. It was unnecessary, and the propriety of such a charge may well be questioned. In view of what has been said in prior cases its giving was not reversible error.

VIII.   Lastly it is strenuously argued that the verdict is without support in the testimony. We can not agree with counsel in this contention. Whilst the testimony was wholly circumstantial, there was enough to warrant the verdict. Reference to a few of the many circumstances is all that seems to be necessary upon this proposition. It is claimed that defendants and deceased were cousins. However this may be, they were together for some time prior to the finding of Nawful's body. The body was found in a ravine in a pasture some three miles from Denison, Iowa, on January 8, 1907. There were three thirty-two caliber bullet wounds in the head, and the back of the skull had been crushed with some blunt instrument. A gray horse and peddler wagon was struck by a train near Dension about midnight on January 5, 1907. This outfit belonged to the deceased. All goods had been removed from the wagon, and none were found at the scene of the wreck or elsewhere. All three men came into Crawford County on January 2, 1907, going toward Denison. They each had quite an amount of merchandise which they evidently intended to dispose of. January 3d defendant Joseph Hassan had his horses reshod and his wagon repaired at a shop in Denison. Hassan took his team and wagon and drove northwest of Denison

18. MURDER: evidence: sufficiency.

on January 3d, and on January 4th drove some miles further north from Denison, staying all night with some farmers on January 4th. At all of these times, he was seen with a revolver holster and belt, and he had but one trunk in his wagon. Solomon Hassan was at a farm house in Crawford County on January 4th, and left his wagon there on the 5th when he started, as he said, to Denison to meet his brother, his codefendant. The two met at Denison, Joseph having borrowed a buggy or spring wagon to make his part of the trip. While there they met deceased. Nawful had in his possession a brown trunk satchel some few days before his body was found. He drove his one horse and buggy into Denison on January 5th and met defendants. When last seen he was in company with Joseph Hassan. That night at about eleven o'clock a large dark colored team hitched to a spring wagon or buggy, with two parties in the front seat, and a gray horse hitched to a peddler wagon, unoccupied, the gray horse being tied to the back end of the spring wagon or buggy, were seen traveling toward Denison about one and one-half miles west of Denison, on the road which leads from the pasture where the dead body of Fred Nawful was found, to the town of Denison. The front team and spring wagon or buggy answered to the description of the team and conveyance that Joseph Hassan had that day, and the gray horse and unoccupied peddler wagon answered the description of the horse and peddler wagon of Fred Nawful. On that same night Joseph Hassan and Solomon Hassan were in the restaurant of Ninas Montgomery near midnight, and they washed themselves, ate a lunch, and left. Joseph Hassan and Solomon Hassan arrived at the home of Joseph Johnson and Oscar Johnson at about two o'clock a. m. of the same night and stayed overnight. Joseph Hassan made the statement that he got the goods he had spoken about; that he had gone to the Illinois Central station and waited a long time for the goods, but

that no goods came for him, and that he then went to
the Chicago & Northwestern station and got the goods
there, and that was the reason he had gotten home so late;
but the state proved that no goods had been shipped to
Denison by either of the said railroad companies for either
Joseph Hassan or Solomon Hassan, during the first six
days of January, 1907, and that neither Joseph Hassan
nor Solomon Hassan got any goods or freight at either
of the two said railway stations on the 5th day of January,
1907.   On the morning of January 6, 1907, when the
Johnson brothers, with whom the Hassans stopped, arose,
there was a brown trunk satchel filled with merchandise,
standing on the porch and Joseph Hassan and Solomon
Hassan took this trunk satchel into the house, and spent
all forenoon of that day sorting over the goods in the trunk
satchel, taking some of the goods in the satchel and put-
ting them into the peddler wagon of Joseph Hassan, and
taking some of the goods out of the peddler wagon and
putting them into the trunk satchel.   Solomon Hassan left
during the afternoon of that day and went to the home
of Gust Anderson, where he had left his horse and peddler
wagon.   On the morning of January 7, 1907, Joseph John-
son helped Joseph Hassan put the trunk satchel, which the
Hassan boys had in the house, into the wagon of Joseph
Hassan.   At first it was almost impossible to put the
satchel into the wagon on account of lack of room, but
they finally managed to put it in the wagon, and at that
time Joseph Hassan had two trunk satchels in his posses-
sion.   Joseph Hassan left the Johnson home on that morn-
ing, and went east to the home of Charley Baker, where
he emptied the trunk satchel and left it at Charley Baker's
home in the attic, stating that he had no room in his
wagon for this satchel.   The state proved that this iden-
tical trunk satchel was the trunk satchel which Fred
Nawful brought with him from Omaha, and was the iden-
tical trunk satchel which he had with him at the home

of one G. P. Kronkhite and at the home of Chris Bahnsen on the nights of January 3 and 4, 1907, and that on the 4th day of January when Joseph Hassan was at the home of Oscar Goodrich he had but one trunk satchel, and that during the night of January 5th the two Hassans brought a trunk satchel with them from Denison and left it standing on the porch of the home of the two Johnson boys, and when Joseph Hassan left the Johnson home he had two trunk satchels, and this made his wagon so crowded that he left one of his trunk satchels at the home of Charley Baker, and this identical trunk satchel is claimed to be the trunk satchel of the murdered man, Fred Nawful.

From the Charley Baker home, Joseph Hassan and Solomon Hassan went on toward Ells, Iowa, and there Joseph Hassan was confronted with the statement of the murder of Fred Nawful. Hassan then almost immediately left one of his horses in the barn of B. F. Ells and rode the other horse to Denison, where he was arrested for the murder. Joseph Hassan then and there made the statement that he had not seen Fred Nawful since January 1, 1907, at Panama, Iowa, and he made the further statement that he had not been in Denison on January 5 1907, and he denied that he had hitched his team to the spring wagon or buggy of Joseph or Oscar Johnson or that he had driven the same to Denison, but he insisted that he had spent all day January 5, 1907, at the Johnson home, that he had not been off the place all day, and that he had not been with Fred Nawful in Denison that day. Solomon Hassan did not go to Denison when he heard of the murder of Fred Nawful, but went on northeast as far as Sac City, where he was arrested and brought to Denison; Sac City being some forty-five miles from Denison.

January 5, 1907, the day of the murder, was a very mild day and it thawed to such an extent that the roads

were muddy. That evening it turned cold and sleeted and froze, and when the dead body of Fred Nawful was found out in the pasture, the tracks of two conveyances—one a two horse conveyance, and one a single horse conveyance— were found leading up to near where the body was found. Under a small willow tree near the body were horseshoe track marks in the frozen ground, showing that two large newly and sharply shod horses had recently stood under this tree. The horse shoes were taken off from the feet of Joseph Hassan's horses, and taken to the pasture where the dead body of Fred Nawful was found, and these horse-shoes fitted perfectly into the horse tracks found in the frozen ground near the willow tree and these horseshoes taken out to the pasture were proved to be the identical shoes which Max Roeh placed on the feet of the horses of Joseph Hassan on the 3d day of January, 1907. .

On the 9th day of January, 1907, Joseph Hassan left one of his horses in the barn of B. F. Ells, while he rode the other to Denison, and in this same barn in a currycomb box, A. B. Ells found a small account book which was proved to be the account book of Joseph Hassan, and in this account book were three loose leaves with accounts on them, which three loose leaves were proved to be leaves taken out of the account book of Fred Nawful, which account book was in the possession of Fred Nawful on the 3d and 4th days of January, 1907, and which three loose leaves proved to be accounts of persons who had purchased merchandise of Fred Nawful on credit.

On the 3d and 4th days of January, 1907, Fred Nawful sold some laces to two different parties, and, after the murder, laces were found in the possession of Joseph Hassan which were the same kinds as had been sold by Fred Nawful to these two parties, and the cut edges of the two kinds of lace that had been sold were matched to the cut edges of the lace found in the goods of Joseph Hassan, and it was shown that the two pieces of lace that

had been sold had been the last pieces cut from bolts of laces found among the goods of Joseph Hassan.

When Solomon Hassan went through Crawford County on his way to Panama shortly before Christmas, 1906, he traveled the road which passes the pasture where Fred Nawful was found dead, and at that time had a ball bat in his possession, and still had this ball bat in his possession when he left Panama for Denison on the 2d day of January, 1907. On his way north through Crawford County on the 3d day of January, 1907, he again traveled the road which passes the said pasture, and on the 4th day of January, 1907, a person by the name of John Weber who was hunting in the said pasture, testified that he saw a ball bat lying near the place where later the dead body of Fred Nawful was found, and this ball bat was proved to be a similar bat to the one Solomon Hassan had in his possession at about Christmas time, 1906. When the dead body of Fred Nawful was discovered, a search for the ball bat which had been seen in this pasture by John Weber, was made, but the bat was missing. On the 6th day of January, 1907, one Carl Evers found a ball bat on the ice beneath the bridge which crosses the West Boyer River near Denison on the direct road which leads to and from the pasture where the dead body of Fred Nawful was found, to Denison. This ball bat had on it at the large end, some material of a red color which was proved by expert testimony to be human blood, and it was further proved that this ball bat found by Carl Evers on the day after the murder was the ball bat of Solomon Hassan.

In the pasture near where the body of Nawful was discovered, four discharged revolver cartridges were found, said empty cartridges being .32 caliber, and of the S. & W. type or make, and these empty cartridges were corroded and indicated that they had been in some revolver for some period of time. In the peddler wagon

of Joseph Hassan was found a five cylinder .32 caliber revolver empty of cartridges, and inclosed in a holster attached to a belt such as Joseph Hassan had on his person on the 3d and 4th days of January, 1907. There was also found in the wagon of Joseph Hassan a box with loaded revolver cartridges of the S. & W. make and of .32 caliber size, all of the said loaded cartridges being new looking except one; this one cartridge being corroded, and indicating that it had been in some revolver for some period of time.

When Fred Nawful was at the home of G. P. Kronkhite on January 3, 1907, he had a large amount of money on his person in the form of bills rolled up, the roll being some four inches in circumstance and also some silver, but when his dead body was found there was no money on his person. When Joseph Hassan was arrested he had on his person a large roll of bills in the amount of $217 and $20.20 in silver and other coins, and when Solomon Hassan was arrested he had on his person money in the sum of $45.57.

When Fred Nawful was at the home of Kronkhite on January 3, 1907, he had in his possession three large handkerchiefs or mufflers of very bright colors, and these same handkerchiefs or mufflers, or three proved to be exactly similar, were found in the peddler wagon of Joseph Hassan.

Upon such a record it is clear that there is ample testimony to support the verdict. No prejudicial error appears, and the judgment must be, and it is *affirmed*.