(May 30, 1923.)

STATE, Respondent, v. WILLIAM DINGMAN, Appellant.

[219 Pac. 760.]

CRIMINAL LAW—CRIMINAL SYNDICALISM ACT—CONSTITUTIONAL—NOT
VAGUE, INDEFINITE, UNCERTAIN OR CLASS LEGISLATION—SENSE IN
WHICH TERMS "CRIMINAL SYNDICALISM" AND "SABOTAGE" USED—
PENAL STATUTE — WHEN SUFFICIENTLY DEFINITE — PURPOSE OF
ACT—INFORMATION—WHEN NOT DUPLICITOUS—INDUSTRIAL WORK-
ERS OF THE WORLD—ITS CHARACTER, PURPOSE AND TEACHINGS—
MATTERS OF COMMON KNOWLEDGE—ITS LITERATURE—WHEN AD-
MISSIBLE AS EVIDENCE—HEARSAY EVIDENCE—WHEN ITS ADMIS-
SION ERROR.

1. C. S., secs. 8580 and 8581, of the Criminal Syndicalism
Act are not unconstitutional as being vague, indefinite and un-
certain in their terms, do not violate the 5th, 6th, and 14th
amendments to the federal constitution or art. 1, sec. 13 of the
Idaho constitution, are not class legislation, do not violate the
constitutional prohibition against cruel and unusual punishment,
and do not invade the personal liberty of citizens, in attempting
to make mere association unlawful.

2. C. S., secs. 8580 and 8581, create and define a crime in
language sufficiently definite and clear to enable an individual to
know with reasonable certainty whether his act is in violation of
the same.

3. The legislature in passing the criminal syndicalism statute
used the terms "criminal syndicalism" and "sabotage" as those
terms had been defined in recent editions of standard dictionaries
and encyclopedias, as well as by courts, and it intended thereby
to denounce that form of syndicalism which advocates crime, sab-
otage, violence or unlawful methods of terrorism as a means of
accomplishing industrial or political reform.

4. In the enactment of the Criminal Syndicalism Act of March
4, 1917, Laws 1917, p. 459, the legislature used the terms "crimi-
nal syndicalism" and "sabotage" in the same sense in which
those terms have been used in other similar acts, by the courts
in the administration of similar laws, and as such terms are de-

Publisher's Note.

1. Validity of legislation directed against social or industrial
propaganda deemed to be of a dangerous tendency, see notes in
A. L. R. 336; 20 A. L. R. 1543.

fined and commonly understood in standard dictionaries, encyclopedias and works of well-known political writers.

5. The legislature in creating an offense may define it by a particular description of the act or acts constituting it, or it may define it as an act which produces or is reasonably calculated to produce a certain described or defined result, or it may group together various means by which the end may be accomplished and make any one of such means an offense, when done to attain the object denounced by the statute.

6. A penal statute is sufficiently definite, although it may use general terms, if the offense is defined so as to convey to a person of ordinary understanding an adequate description of the evil intended to be prohibited.

7. A statute defining criminal syndicalism is not objectionable for the reason that the offense may be committed in one of several ways: (1) by word of mouth, writing or teaching the duty, necessity or propriety of doing the prohibited acts; (2) by printing, publishing, editing, issuing or circulating books, papers or documents advocating the unlawful doctrine; (3) by openly and deliberately justifying crime or sabotage; (4) by organizing, helping to organize or attempting to organize, or becoming a member, or being a member, continuing to retain such membership in, an assembly of persons who teach or advocate such doctrines.

8. The design and purpose of the legislature in the enactment of these statutes was the suppression of what was deemed by the lawmakers a growing menace in the state, arising from sabotage and other unlawful methods of terrorism, employed in the furtherance of industrial ends, and in the adjustment of alleged grievances against employers.

9. It is the exclusive province of the legislature to declare what acts deemed by the lawmakers inimical to the public welfare shall constitute a crime, and to prohibit the same, and impose approximate penalties for the violation thereof, and judicial construction of such laws is limited to whether the constitutional rights of the citizen have been invaded or violated.

10. Under C. S., sec. 8829, an information is not duplicitous where a single offense sought to be charged may be committed by several means, if the ways and means are not repugnant. Since the acts of advocating the doctrine of criminal syndicalism, organizing, becoming a member of or meeting with an organization that advocates such doctrines, are made unlawful, all of said acts may be a part of one transaction.

11. Since the organization known as the Industrial Workers of the World, organized in 1905 by Eugene V. Debs and W. D.

Haywood, has been so frequently referred to in the current literature of the day, including the reported decisions of the courts, standard dictionaries, encyclopedias and works of like character, as being an organization which advocates the doctrine of crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform, books, pamphlets, membership cards, preamble and constitution of the order, applications for membership, copies of the newspaper publication, and other literature pertaining to the teachings, doctrines and purposes and objects of this organization published by authority and with the approval of its leaders, are admissible in evidence against a defendant on trial for being a member of such order.

12. On a trial of a person charged with organizing, helping to organize, becoming a member, and being a member, continuing to retain such membership, with the Industrial Workers of the World, the same being a society, group or assemblage of persons formed to teach, advocate, and which did teach and advocate, the doctrines of criminal syndicalism, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform, the extrajudicial statements of persons not in any way connected with the action, who are claimed to have told the witnesses who related these alleged conversations that they were members of the organization, and as to its doctrines and teachings, are hearsay and inadmissible.

13. On the trial of one charged with organizing, becoming a member and continuing such membership, and advocating the doctrines of the Industrial Workers of the World, testimony as to the extrajudicial statements of persons not connected with the action, but who claimed to be members of the order, or who the witnesses believed were members of the order, told such witnesses concerning its purposes, teachings and doctrines, was not admissible under the rule with reference to the testimony of co-conspirators in a conspiracy action.

APPEAL from the District Court of the Eighth Judicial District, for Bonner County. Hon. Robert N. Dunn, Judge.

William Dingham was convicted of a violation of the Criminal Syndicalism Act, and appeals. *Reversed* and *remanded* for new trial.

Albert Streiff, for Appellant.

The law under which the prosecution is had, C. S., secs. 8580 and 8581, is unconstitutional for the following reasons:

It is vague, indefinite and uncertain in its terms. (5th, 6th and 14th Amendments to U. S. Const., art. 1, sec. 13, Idaho Const.; *Tozier v. United States,* 52 Fed. 917; *Holmberg v. Jones,* 7 Ida. 752, 65 Pac. 563; *Hewitt v. Board of Medical Examiners,* 148 Cal. 590, 113 Am. St. 315, 7 Ann. Cas. 750, 84 Pac. 39, 3 L. R. A., N. S., 896; *United States v. Reese,* 92 U. S. 214, 23 L. ed. 563; *State v. Mann,* 2 Or. 239; *Cook v. State,* 26 Ind. App. 278, 59 N. E. 489; *Ex parte Jackson,* 45 Ark. 158; *State v. Gaster,* 45 La. Ann. 646, 12 So. 739; *Louisville & N. R. Co. v. Commonwealth,* 99 Ky. 132, 59 Am. St. 457, 35 S. W. 129, 23 L. R. A. 209; *Baltimore & O. Ry. v. Railway Com.,* 196 Fed. 690; *Chicago I. & L. Ry. Co. v. Salem,* 166 Ind. 71, 76 N. E. 631; *State v. International G. N. Ry.* (Tex. Civ.), 165 S. W. 892; *Gulf C. & F. S. Ry. Co. v. Dwyer,* 84 Tex. 194, 19 S. W. 471; *State v. Jack Diamond,* 27 N. M. 477, 202 Pac. 988.)

It is class legislation and attempts to create an unreasonable classification denying equal protection of laws. (Art. 1, secs. 2, 3, art. 3, sec. 19, Idaho Const.; 14th Amendment U. S. Const.; *Ex parte Mallon,* 16 Ida. 737, 103 Pac. 374; *Green v. State,* 83 Neb. 84, 131 Am. St. 626, 119 N. W. 6; *State v. Holland,* 37 Mont. 393, 96 Pac. 719.)

It violates the constitutional prohibition against cruel and unusual punishments. (Art. 1, sec. 6, Idaho Const.; *State v. Crawford,* 74 Wash. 248, 133 Pac. 590, 46 L. R. A., N. S., 1039; *Ex parte Young,* 209 U. S. 123, 14 Ann. Cas. 764, 28 Sup. Ct. 441, 52 L. ed. 714, 13 L. R. A., N. S., 932; *Ex parte Wood,* 155 Fed. 190.)

It attempts to invade the personal liberties of the citizens in a manner not justified by law, in that it attempts to make mere association unlawful. (*Ex parte Smith,* 135 Mo. 223, 58 Am. St. 576, 36 S. W. 628, 33 L. R. A. 606; *Watertown v. Christnacht,* 39 S. D. 290, 164 N. W. 62; *City of St. Louis v. Gloner,* 210 Mo. 502, 124 Am. St. 750, 109 S. W. 30, 15 L. R. A., N. S., 973; *Pinkerton v. Verberg,* 18 Mich. 573, 44 N. W. 579; *City of St. Louis v. Roche,* 128 Mo. 541, 31 S. W. 915; *Gastenau v. Comm.* (Tex. Crim.), 56 S. W. 75; *City of Lancaster v. Reed* (Mo. App.), 207 S. W. 868.)

The information does not state an offense. (*State v. Scheminisky,* 31 Ida. 504, 174 Pac. 611; *Pettibone v. United States,* 148 U. S. 197, 13 Sup. Ct. 542, 37 L. ed., 419; *State v. Cole,* 31 Ida. 603, 174 Pac. 131; *State v. Smith,* 25 Ida. 541, 138 Pac. 1107; *State v. Wolf,* 56 Mont. 493, 185 Pac. 556; *Foster v. United States,* 253 Fed. 481; *State v. Carey,* 4 Wash. 424, 30 Pac. 729; *State v. Swenson,* 13 Ida. 1, 81 Pac. 379; *State v. Dodd,* 84 Wash. 436, 147 Pac. 9; *State v. Muller,* 80 Wash. 368, 141 Pac. 910; *United States v. Cruikshank,* 92 U. S. 542, 23 L. ed. 588; *United States v. Watson,* 17 Fed. 145; C. S., sec. 8827.)

The acts and statements of persons other than defendant were hearsay, irrelevant, incompetent, immaterial and prejudicial and the court erred in failing to instruct as requested by defendant's requested instruction No. 40. (6th Amendment, U. S. Const.; 16 C. J. 622 et seq.; *Mima Queen v. Hepburn,* 7 Cranch (U. S.), 296, 3 L. ed. 348; Jones on Evidence, 2d ed., sec. 297; 6 R. C. L. 85; *People v. Whalen,* 154 Cal. 472, 98 Pac. 194; *People v. Hill,* 123 Cal. 571, 56 Pac. 443; *State v. Thompson,* 69 Conn. 720, 38 Atl. 868; *State v. Nist,* 66 Wash. 55, Ann. Cas. 1913C, 409, 118 Pac. 920; *People v. Driggs* (Cal.), 108 Pac. 62; *People v. Schwartz,* 163 N. Y. Supp. 821; *O'Neill v. State,* 51 Tex. Cr. 100, 100 S. W. 919; *Brokhaus v. State,* 11 Okl. Cr. 625, 150 Pac. 510; *State v. Gibson,* 115 Wash. 512, 197 Pac. 611; *State v. Pettilla,* 116 Wash. 589, 200 Pac. 332.)

No facts appearing in dictionaries or encyclopedias can be judicially noticed except such as are matters of common knowledge. (*Koolatype Eng. Co. v. Hope,* 30 Fed. 444; 7 Ency. of Ev. 892.)

Courts should refuse to exercise the function of judicial notice where there is any reason to doubt of its propriety. (*Brown v. Piper,* 91 U. S. 37, 23 L. ed. 200; *Gunning v. People,* 189 Ill. 165, 82 Am. St. 433, 59 N. E. 494; *United States v. Mayer,* 252 Fed. 868.)

Pamphlets and written exhibits were hearsay, immaterial, incompetent, irrelevant and prejudicial. (16 C. J., p. 741; 22 C. J. 900, 901, 906.)

Roy L. Black, Former Attorney General, A. H. Conner, Attorney General, and Jas. L. Boone, Assistant, for Respondent.

The law is not vague, indefinite and uncertain in its terms. (*State v. Brown,* 108 Wash. 205, 182 Pac. 944; *State v. Omaechevviaria,* 27 Ida. 797, 152 Pac. 280; *Adams v. Landson,* 18 Ida. 483, 110 Pac. 280; *State v. Fox,* 71 Wash. 185, 127 Pac. 1111; *State v. Stuth,* 11 Wash. 423, 39 Pac. 665; *Waters-Pierce Oil Co. v. Texas,* 212 U. S. 86, 29 Sup. Ct. 220, 53 L. ed. 417; *People v. Malley,* 49 Cal. App. 597, 194 Pac. 48; *State v. Hennessy,* 114 Wash. 351, 195 Pac. 211; *State v. Laundy,* 103 Or. 443, 204 Pac. 958, 206 Pac. 290.)

It is not class legislation and does not create unreasonable distinction between classes and persons. (*State v. Moilen,* 140 Minn. 112, 1 A. L. R. 331, 167 N. W. 345; *State v. Calloway,* 11 Ida. 719, 114 Am. St. 258, 84 Pac. 27, 47 L. R. A., N. S., 109; *State v. Dolan,* 13 Ida. 693, 92 Pac. 995, 14 L. R. A., N. S., 1259; *State v. Horn,* 27 Ida. 782; *Sifers v. Johnson,* 7 Ida. 798, 97 Am. St. 271, 65 Pac. 709, 79 Pac. 459, 54 L. R. A. 785; *Sweet v. Ballentyne,* 8 Ida. 431, 69 Pac. 995; *Spencer v. Morgan,* 10 Ida. 542; *State v. Fraternal Knights & Ladies,* 35 Wash. 338, 77 Pac. 500; *Olson v. Idora Hill Mining Co.,* 28 Ida. 504, 155 Pac. 291; *State v. Hennessy,* 114 Wash. 351, 195 Pac. 211; *Keokee Co. v. Taylor,* 234 U. S. 224, 34 Sup. Ct. 856, 58 L. ed. 1288; *Patsone v. Pennsylvania,* 232 U. S. 138, 34 Sup. Ct. 281, 58 L. ed. 539.)

The law does not violate the constitutional prohibition against cruel and unusual punishment. (*State v. Moilen, supra; State v. Hennessy, supra.*)

The law does not invade the personal liberties of citizens. (*State v. Pitney,* 79 Wash. 608, Ann. Cas. 1916A, 209, 140 Pac. 918; *Sifers v. Johnson,* 7 Ida. 798, 97 Am. St. 271, 65 Pac. 709, 54 L. R. A. 785; *State v. Horn,* 27 Ida. 782, 152 Pac. 275; *State v. Griffin,* 1 Ida. 476; *In re Crane,* 27 Ida. 671, 151 Pac. 1006, L. R. A. 1918A, 942; *Idaho Power Co. v. Blomquist,* 26 Ida. 222, Ann. Cas. 1916E, 282, 141

Pac. 1083; *State v. Dolan,* 13 Ida. 693, 92 Pac. 995, 14 L. R. A., N. S., 1259; *Munn v. Illinois,* 94 U. S. 113, 24 L. ed. 77; *Canfield v. United States,* 167 U. S. 518, 17 Sup. Ct. 864, 42 L. ed. 260; *State v. Hennessy, supra; State v. Laundy, supra.*)

The information is not indefinite, uncertain and repetitious. (*State v. O'Neil,* 24 Ida. 582, 135 Pac. 60; *People v. Butler,* 1 Ida. 231; *State v. Mays,* 1 Ida. 763; *State v. Ellington,* 4 Ida. 529, 43 Pac. 60; *State v. Rathbone,* 8 Ida. 161, 67 Pac. 186; *State v. Brill,* 21 Ida. 269, 121 Pac. 79; *State v. Lundhigh,* 30 Ida. 365, 164 Pac. 690; *State v. Lowery,* 104 Wash. 520, 177 Pac. 355; *State v. Hennessy, supra; State v. Malley, supra;* C. S., secs. 8825, 8827, 8834.)

The information is not duplicitous. (C. S., sec. 8829; *State v. Hennessy, supra; State v. Gruber,* 19 Ida. 692, 115 Pac. 1; *Territory v. Guthrie,* 2 Ida. 432, 17 Pac. 39; 14 R. C. L. 177, 194, secs. 25, 40; 22 Cyc. 378, 380, notes 76, 86; Am. Digest, 2d Dec., Indictment and Information, sec. 125, par. 19; *People v. Walfrom,* 15 Cal. App. 732, 115 Pac. 1088; *People v. Wyman* (Mont.), 186 Pac. 1; *State v. Barrow,* 17 Okl. Cr. 340, 188 Pac. 351; *State v. Klein,* 292 Ill. 420, 127 N. E. 72; *State v. Moilen,* 140 Minn. 112, 1 A. L. R. 331, 167 N. W. 345; *State v. Laundy, supra.*)

The acts and statements of other alleged members were not hearsay. (*Dawson v. State,* 96 Neb. 777, 148 N. W. 957; *People v. Roe,* 58 Cal. App. 690, 209 Pac. 381; *People v. Steelik,* 187 Cal. 361, 203 Pac. 78.)

The state's exhibits consisting of books and pamphlets were not immaterial, irrelevant, hearsay and prejudicial. (*State v. Moilen, supra; State v. Lowery, supra; State v. Malley, supra; State v. Hennessy, supra; Ex parte Vernat,* 255 Fed. 429; *United States v. Swelgin,* 254 Fed. 884; *Spies v. People,* 122 Ill. 1, 93 Am. St. 320, 12 N. E. 865, 17 N. E. 898; *Isenhouer v. United States,* 256 Fed. 842; *Kumpula v. United States,* 261 Fed. 409; *Reader v. United States,* 262 Fed. 36; 8 Cyc. 1399.)

WILLIAM A. LEE, J.—On the 22d day of December, 1919, the prosecuting attorney of Bonner county, Idaho, charged appellant jointly with twenty-two others:

"Of the crime of a felony, to wit: The advocacy of the doctrine of criminal syndicalism, which doctrine advocates crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform, committed as follows, to wit:

"That the said William Dingman (and 22 others) and each of them, on or about the 14th day of November, 1919, in Bonner County, Idaho, then and there being, did then and there wilfully, unlawfully and feloniously advocate, teach and advise the duty, necessity and propriety of crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform, by unlawful means of a society, group and assemblage of persons, then and there known as the 'Industrial Workers of the World,' which said 'Industrial Workers of the World' was then and there formed to teach and advocate, and does teach and advocate, the doctrines of criminal syndicalism and the duty, necessity and propriety of crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform; and they, the said defendants, then and there being, did then and there organize, help to organize, and become members of, and being members thereof, continue and retain such membership with the said 'Industrial Workers of the World,' the same being a society, group and assemblage of persons formed to teach and advocate, and which did then and there, and which does, teach and advocate, the doctrines of criminal syndicalism, to-wit, the doctrines which advocate crime, sabotage, violence and unlawful means of terrorism as a means of accomplishing industrial and political reform, contrary to the form of the statute in such case made and provided, etc."

To this information the defendants demurred on the grounds: (1) that it did not conform to C. S., secs. 8825,

8826 and 8827; (2) that it did not state a public offense; (3) that it is duplicitous. The demurrer was overruled, and defendants moved for a separate trial, which was denied, and also to require the state to elect upon which offense it would stand as to each of the defendants, and to require the state to elect upon which particular transaction it would stand, all of which motions were denied. The case proceeded to trial, and resulted in a verdict of guilty against the defendant William Dingman, and not guilty as to all of the other defendants. A motion was made in arrest of judgment, based upon substantially the same grounds as stated in the demurrer, which was denied. Appellant then moved for a new trial, upon the grounds: (1) that the verdict is contrary to law; (2) that it is contrary to the evidence; (3) that the court misdirected the jury in matters of law; (4) that the court erred in questions of law arising during the trial; (5) that the jury received evidence out of court, other than that resulting from a view of the premises; (6) newly discovered evidence. This motion was denied, and appellant was sentenced to pay a fine of $1,000 and the costs of the prosecution, amounting to $964.20, and in default of payment of such fine, to be imprisoned in the county jail of Bonner county one day for every five dollars of such fine. From this judgment and the order denying a new trial, this appeal is taken, upon seventy-nine assignments of error.

Appellants' counsel suggest in their brief that it is beyond appropriate limits to discuss with thoroughness each and every of these assignments, and they accordingly group them under five headings: (1) assignments which raise questions as to the constitutionality of the law; (2) assignments which predicate error upon the sufficiency of the information; (3) assignments which predicate error upon the admission or exclusion of evidence; (4) assignments raising questions as to the sufficiency of the evidence; (5) assignments which predicate error upon the instructions. This seems to be a logical and comprehensive method of considering the ques-

tions presented by this appeal, and we will endeavor as nearly as may be to follow the same in this discussion.

Appellant contends that C. S., secs. 8580 and 8581, the Criminal Syndicalism Act, is unconstitutional, for the reasons: (a) that it is vague, indefinite and uncertain in its terms, and particularly violates the 5th, 6th and 14th amendments to the federal constitution and art. 1, sec. 13 of the Idaho constitution; (b) that it is class legislation; (c) that it violates the Idaho constitutional prohibition against cruel and unusual punishments, art. 1, sec. 6; (d) that it invades the personal liberties of a citizen, in that it attempts to make unlawful mere association.

Appellant further contends that C. S., secs. 8580 and 8581, do not create or define a crime in language sufficiently definite and clear to enable an individual to know with reasonable certainty whether his act would be in violation of the same, and particularly objects to the term "sabotage," as used in this statute, because prior to its enactment the word was not defined in recent editions of standard dictionaries in use. He reasons that when these terms were used in the statute, neither the legislature nor the common people could have had any knowledge of the sense in which the terms were used.

Syndicalism is defined in the 1913 edition of the Standard Dictionary as:

"An economic movement originating in France, but now widespread, which aims at the federation of workers in all trades into an effective unity for the purpose of enforcing the demands of labor by means of sympathetic strikes."

Webster's New International Dictionary, edition of 1913, addenda of 1918, defines it as:

"The theory, plan or practice of trade union action . . . . which aims to abolish the present political and social system by means of the general strike . . . . and direct action . . . . which is any kind of action that is directly effective, whether it be a simple strike, a peaceful public demonstration, sabotage or revolutionary violence, etc."

Nelson's Encyclopedia, edition of 1913, vol. 11, page 459, says:

"Syndicalism. A revolutionary working class movement, having for its aim the ownership and control by industrial organizations of the means of production and distribution, thus making the working man his own employer, and securing to him the entire product of his labor. . . . .

"In the United States, syndicalism appeared as early as 1896, in a revolt against the old trade union movement. Its principal exponent is the Industrial Workers of the World (I. W. W.), organized in 1905 under the leadership of Eugene V. Debs and W. D. Haywood."

The legislature of this state, in passing the syndicalism statute, as well as the several states that have adopted a similar statute, used the term "criminal syndicalism" intending thereby to denounce only such a form of syndicalism as is distinctly criminal in its purpose, and in order to make clear the act or acts denounced by the statute, defined it as follows:

"The doctrine which advocates crime, sabotage, violence or unlawful methods of terrorism as a means of accomplishing industrial or political reform."

Counsel for appellant particularly object to the use of the word "sabotage," because of its recent coinage, and insist that it not having been defined in standard dictionaries until after the passage of this law, neither the legislature nor the people could understand its meaning.

Webster's New International Dictionary, edition of 1913, defines "sabotage" as:

"(a) Scamped work. (b) Malicious waste or destruction of an employer's property during labor troubles."

The Standard Dictionary of the same date defines "sabotage" as:

"(1) The act of cutting shoes or sockets for rails in railroad ties. (2) By extension, the act of tying up a railroad by malicious damage. (3) Hence, any poor work or other damage done by dissatisfied workmen, also the act of producing it; plant-wrecking."

Nelson's Encyclopedia, edition of 1913, vol. 10, page 489, defines "sabotage" as:

"The system used by certain working men in connection with or instead of a strike. It is defined as the organized hampering of production by slack work, skilful disabling of machinery, or the publication of trade secrets. Its adherents justify it under the special morality which they claim for the proletariat, as an emergency measure in the war against capital, the *sabateur* being comparable to the spy.

"The practice first came into prominence in France about 1895, and has spread rapidly. Its first formal acceptance by a labor organization was at the congress of the French General Confederation of Labor in 1897, and this acceptance was affirmed at the congress of 1900. In the United States, the policy is advocated by the Industrial Workers of the World. The Socialist party of the United States condemned sabotage in their national platform of 1912."

The New International Encyclopedia, one of the most recent reference works and general histories, under the title of "Industrial Workers of the World," in expounding the principles of the organization, states:

"It is the duty of the workers to injure the employer wherever possible, in accordance with its underlying philosophy. The tactics of the Industrial Workers of the World is that of guerilla warfare. Such methods of injuring the employer are known as sabotage. Sabotage may consist in throwing the progress of production out of order, through tampering with machinery, improper use of material, or loitering at work."

It may safely be concluded that the legislature of this state used the terms "criminal syndicalism" and "sabotage" in the act of March 14, 1917, advisedly, and in the sense in which they had been used by other legislatures and standard works, and by courts in the administration of similar laws in other jurisdictions, for some time prior to its enactment in this state. It may be remarked, however, that if the word

"sabotage" should be eliminated from the statute, the offense intended to be prohibited would still be clear, as applying to the doctrine which advocates crime, violence or unlawful methods of terrorism as a means of accomplishing industrial or political reform.

"The legislature in creating an offense may define it by a particular description of the act or acts constituting it, or it may define it as any act which produces, or is reasonably calculated to produce, a certain defined or described result, or it may group together various means by which the end may be accomplished and make any one of such means an offense when done to attain the object denounced by the statute. In the absence of a provision to the contrary, a statute may punish an offense by giving it a name known to the common law, without further defining it, and the common-law definition will be applied. In creating an offense which was not a crime at common law, a statute must of course be sufficiently certain to show what the legislature intended to prohibit and punish, otherwise it will be void for uncertainty. Reasonable certainty, in view of the conditions, is all that is required, and a liberal effect is always to be given to the legislative intent when possible. . . . . A penal statute is sufficiently certain, although it may use general terms, if the offense is so defined as to convey to a person of ordinary understanding an adequate description of the evil intended to be prohibited." (16 C. J. 67, sec. 28; *Stewart v. State,* 4 Okl. Cr. 564, 109 Pac. 243, 32 L. R. A., N. S., 505; *State v. Lawrence,* 9 Okl. Cr. 16, 130 Pac. 508; *State v. Fox,* 71 Wash. 185, 127 Pac. 1111; *State v. Lowery,* 104 Wash. 520, 177 Pac. 355; *State v. Hennessy,* 114 Wash. 351, 195 Pac. 211; *People v. Malley,* 49 Cal. App. 597, 194 Pac. 48; *People v. Steelik,* 187 Cal. 361, 203 Pac. 78; *People v. Lesse,* 52 Cal. App. 280, 199 Pac. 46; *State v. Laundy,* 103 Or. 443, 204 Pac. 958, 206 Pac. 290.)

We think the statute and the information based thereon are not vulnerable to the attack that the language is so indefinite and uncertain that an individual may not know with reasonable certainty whether his act is in violation of the

same. Criminal syndicalism is clearly defined by the statute as: "That doctrine which advocates crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform," and the defendant was charged with advocating, teaching and advising the duty, necessity and propriety of crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform; that this teaching was accomplished by means of a society, group or assemblage of persons known as the Industrial Workers of the World, and that this organization was formed to teach and advocate such unlawful practices; and that the defendant organized, helped to organize, and became a member, and continued to be a member, of such organization.

Neither do we think that this statute is open to the objection of creating an unreasonable distinction between classes and persons, because it limits the offense to the advocacy of the doctrine announced as a means of accomplishing industrial and political reform, and does not, in terms at least, make such advocacy a crime if committed for other purposes, within the act. Nor is it objectionable for the reason that the offense may be committed in one of several ways: (1) by word of mouth, writing or teaching the duty, necessity and propriety of doing the prohibited acts; (2) or by printing, publishing, editing, issuing, knowingly circulating, selling, distributing or publicly displaying books, papers, documents, or written matter in any form, containing or advertising the unlawful doctrine of criminal syndicalism denounced by the statute; (3) or openly or deliberately justifying crime or sabotage; (4) or helping to organize, attempting to organize or becoming a member, or being a member, continuing to retain such membership, or voluntarily assembling with any society, group or assembly of persons who teach or advocate the doctrine of criminal syndicalism. Neither is this statute open to the objection that it restricts free speech concerning industrial questions to mere praise of existing conditions, nor is it simply an instrument used by

the dominant class for the purpose of suppressing another class, and enforced only for the purpose of preventing this other class from discussing reform, as urged by counsel in their brief.

"The design and purpose of the legislature in the enactment of the statute was the suppression of what was deemed by the lawmakers a growing menace in the state, arising from sabotage and other unlawful methods of terrorism employed . . . . in furtherance of industrial ends, and in adjustment of alleged grievances against employers. The facts surrounding the practice of sabotage and like *in terrorem* methods of self-adjudication of alleged wrongs are matters of common knowledge and general public notoriety, of which the courts will take notice. That they are unlawful and within the restrictive power of the legislature is clear. Sabotage, as practiced by those advocating it as an appropriate and proper method of adjusting labor troubles, embraces, among other lesser offensive acts, the wilful and intentional destruction of the property of the employer, in retaliation for his failure or refusal to comply with wage or other kindred labor demands. It amounts to malicious mischief, and is a crime at common law, as well as by statute. The methods of terrorism referred to in the statute have a close relation to sabotage, and are practiced for the purpose of intimidation, and to coerce employers into a compliance with labor demands. Methods of that sort are equally unlawful and open to legislative condemnation.

"It is the exclusive province of the legislature to declare what acts deemed by the lawmakers inimicable to the public welfare shall constitute a crime, to prohibit the same, and impose appropriate penalties upon a violation thereof . . . . judicial construction of enactments of the kind is limited to the inquiry whether the constitutional rights of the citizen have been invaded or violated." (*State v. Moilen,* 140 Minn. 112, 167 N. W. 345, 1 A. L. R. 331. To the same effect are *People v. Malley,* 49 Cal. App. 597, 194 Pac. 48; *State v. Hennessy,* 114 Wash. 351, 195 Pac. 211; *State v. Laundy,* 103 Or. 443, 204 Pac. 958, 206 Pac. 290.)

We think what has been said, with the discussion in the authorities cited, effectually disposes of the additional points made under the first general assignment, that this is class legislation and attempts to create an unreasonable classification, or that it violates the constitutional prohibition against cruel and unusual punishments, or that it attempts to invade the personal liberty of the citizen in a manner not justified by law, in that it makes mere association unlawful.

The second general assignment contends: (a) that the information is indefinite and uncertain; (b) that it is duplicitous, and in particular is repugnant to C. S., secs. 8825, 8827, 8829 and 8834. The first two sections mentioned relate to the statutory requirements of the indictment, equally applicable to an information, and require that the acts constituting the offense shall be stated in ordinary, concise language, so as to enable a person of ordinary understanding to know what is intended and the particular circumstances of the offense charged, when they are necessary to constitute a complete offense. Sec. 8834 describes under seven subdivisions the requirements that make an indictment or information sufficient. For the reasons already given, and upon the authorities cited, we do not think that the information in this case is out of harmony with any of the several sections of the statute enumerated. C. S., sec. 8829, requires:

"The indictment must charge but one offense, but the same offense may be set forth in different forms under different counts; and when the offense may be committed by different means, the means may be alleged in the alternative in the same count."

Counsel for appellant earnestly contend that this information is violative of the foregoing statute, and that it clearly charges three separate and distinct offenses in the same count; first, that the defendant organized; second, that he helped to organize; and third, became a member, and being a member, continued and retained such membership. We think the information may be further analyzed and subdivided, and held to charge the defendant with: (1) advocat-

ing the prohibited doctrine; (2) organizing and helping to organize an assemblage of persons known as the Industrial Workers of the World; (3) becoming a member of such society; (4) retaining such membership. All of these acts would fall under subdivisions 1, 3 and 4 of C. S., sec. 8581, and the information also charges a violation of C. S., sec. 8582, which makes an assemblage of persons for the purpose of advocating or teaching such doctrine unlawful, and every person participating, aiding or instigating any such assembly guilty of a felony. But does this make the information duplicitous, or in contravention of said provision of the statute limiting the charge to one offense?

The act defines criminal syndicalism as the doctrine which advocates crime, sabotage, violence or unlawful methods of terrorism as a means of accomplishing industrial or political reform, and makes the advocacy of such doctrine a felony. The following sections then attempt more specifically to describe the offense intended to be denounced by the statute, and the different methods or ways by which such offense may be committed. But in the last analysis, it is clear that the purpose of the legislature was to define the offense of criminal syndicalism, and make clear what specific acts, if committed, would constitute criminal syndicalism. It has said that it may be committed by the doing of any of the several acts mentioned, but it has not said that each one of these several acts constitutes a separate offense under the statute, but only that any or all of them constitute the crime of "criminal syndicalism," which is denounced as a felony, punishable by the specific penalty therein mentioned. If the facts charged constitute but a single offense, the indictment is not duplicitous; hence acts of omission and commission which form component parts or represent preliminary steps of a transaction may be charged together.

"It is a well-settled rule of criminal pleading that when an offense against a criminal statute may be committed in one or more of several ways, the indictment may, in a single count, charge its commission in any or all of the ways speci-

fied in the statute. So where a penal statute mentions several acts disjunctively and prescribes that each shall constitute the same offense and be subject to the same punishment, an indictment may charge any or all of such acts conjunctively as constituting a single offense. Or as the same rule is frequently stated, where a statute makes either of two or more distinct acts connected with the same general offense and subject to the same measure and kind of punishment, indictable separately and as distinct crimes when each shall have been committed by different persons and at different times, they may, when committed by the same person and at the same time be coupled in one count as together constituting one offense; and this is true, although a disjunctive participle is not employed in the statute, but a conjunction is used which is disjunctive in sense." (22 Cyc. 280, and authorities there cited; *Morgan v. United States,* 148 Fed. 189, 78 C. C. A. 323; *United States v. Swift,* 188 Fed. 92; *United States v. Charter,* 227 Fed. 331.)

"Where a statutory offense may be committed in one or more of several ways, an indictment may in a single count charge its commission in any or all of the ways specified." (*Sanford v. State,* 8 Ala. App. 245, 62 So. 317; *Pearce v. State,* 97 Ark. 5, 132 S. W. 986; *State v. Browning,* 153 Iowa, 37, 133 N. W. 330; *State v. Justus,* 86 Kan. 848, 122 Pac. 877; *State v. Kelsey,* 80 N. J. L. 641, 77 Atl. 1028.)

Where a statute disjunctively provides several ways in which an offense may be committed, and all are defined in the same way, and made punishable in the same manner, they may be charged conjunctively in the same count. (*State v. Yates,* 145 Iowa, 332, 124 N. W. 174; *State v. Corwin,* 151 Iowa, 420, 131 N. W. 659; *State v. Tolley,* 23 N. D. 284, 136 N. W. 784; *State v. Brown,* 10 Okl. Cr. App. 52, 133 Pac. 1143; *Goodwin v. State,* 70 Tex. Cr. 600, 158 S. W. 274; *Stevens v. State,* 70 Tex. Cr. 565, 159 S. W. 505.)

In *State v. Hennessy,* 114 Wash. 351, 195 Pac. 211, that court, in discussing this question, as to an information based upon a statute similar to our own, said:

"The information does charge the appellant with helping to organize, voluntarily assembling with, giving aid to, and being a member of the Industrial Workers of the World, and that he did print, publish, circulate and distribute certain books, pamphlets, etc.

"It is a general rule that, when a single offense may be committed in different ways or by different means, it may be charged in the information to have been committed by more than one of the ways and means."

In *State v. Laundy,* 103 Or. 443, 204 Pac. 958, 206 Pac. 290, in discussing the question as to whether an information was duplicitous, based upon a statute the same as the Idaho statute, that court held:

"Where a single offense may be committed by several means, it may be charged in a single count to have been so committed, if the ways and means are not repugnant. . . . . Since the acts of organizing, becoming a member of, and meeting with an organization advocating the doctrine of criminal syndicalism made a felony by the Syndicalism Act, sec. 3, may all be parts of one transaction and are not repugnant, an indictment charging that appellant at the specified time and place committed all of those acts is not subject to demurrer on the ground of duplicity."

Appellant's general assignment designated as "3–C" embraces specific assignments 9 to 30, and is based upon the admission of the state's exhibits, consisting of books, pamphlets, membership cards, preamble and constitution, secretary's reports, applications for membership, credentials, copies of a newspaper publication called "The New Solidarity," "Sabotage," by Pouget, "Sabotage, Its History, Philosphy and Function," by Smith, "The One Big Union," "The Revolutionary I. W. W.," "The General Strike," by Haywood, a great variety of small posters termed "stickerettes," song books and other literature pertaining to the teachings, doctrines, purposes and objects of this organization. Much of it is of a highly inflammatory character, well calculated to incite lawlessness among its votaries, and teach them to advocate and advise the duty, necessity and pro-

priety of crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform. Obviously, it is not practicable, nor is it necessary to a determination of the question before us, to consider and discuss *seriatim* these exhibits, approximating several hundred in number. The testimony upon which they were admitted in the record was that they had been found by searches and seizures in the camps and upon persons who stated that they were I. W. W.'s, and these exhibits were admitted by the trial court upon the theory that they were being circulated by members of the I. W. W., and had probative value in establishing the state's contention that the organization taught and advocated the doctrine of criminal syndicalism as charged in the information, appellant having admitted his membership in the organization. It is contended that the evidence does not connect the finding of these exhibits with the members of the order, and that being private writings, they do not tend to prove themselves, and further that the mere finding of these books and other exhibits in great quantities upon individuals who are members of the organization, in their headquarters and meeting places, or where they resided, does not establish the fact of their official promulgation by the order itself.

Most of these books and pamphlets are published by the "I. W. W. Publishing Bureau," but it is urged as an objection to their admission that there is no evidence that these exhibits constitute the teachings of this organization, and it is further urged against their admission that the authors of these publications were not brought before the court, nor was the defendant given an opportunity to cross-examine them relative to whether the views expressed in the books represented the ideas of the organization correctly or otherwise, and hence that they should be excluded on the ground of their being hearsay.

These exhibits relate to and expound the doctrine of this order, and purport upon their face to be publications made under authority of its organization. It appears from the evidence that this literature was not only approved by the

leaders of the organization, but that its circulation as propaganda on its behalf was actively urged. Large quantities of these publications, together with many other works of similar character, were found and taken from the headquarters and general meeting places of the members of the order, very many of the exhibits having been taken directly from the possession or immediate presence of some one or more of the defendants. As has already been shown, the purposes of the I. W. W. are a part of the current history of the day, and of the times. As we have seen, standard dictionaries and encyclopedias, as well as the courts, characterize this organization as one advocating the doctrine of crime, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform. It is not necessary to make extensive quotations from these various publications which were introduced in evidence, in order to illustrate their character, illustrations of which may be found in *State v. Moilen,* 140 Minn. 112, 167 N. W., at 348, 1 A. L. R. 331, and *State v. Breen,* 110 Kan. 817, 205 Pac., at 634. They have been so frequently referred to in the current literature of the day, including the reported decisions, that they have become a part of the current political history of the times, and are clearly admissible for the purpose of showing the character and teachings of this order. (*People v. Malley,* 49 Cal. App. 597, 194 Pac. 48; *People v. Lesse,* 52 Cal. App. 280, 199 Pac. 46; *People v. Taylor,* 187 Cal. 378, 203 Pac. 85.)

Furthermore, as said in *Haywood v. United States,* 268 Fed. 795, at 807:

"14. Evidence of the organization of the I. W. W., the defendant's control, and the methods of operation, through correspondence, pamphlets and official newspapers, was competent, though antedating the laws in question, as bearing on defendant's possession and knowledge of the use of the means by which these felonies could be committed. Furthermore, the presumption of continuing possession and knowledge was fortified by evidence of the same conditions down to the time of the indictment.

37 Idaho.—18

"15. Newspaper articles and pamphlets, printed before the statutes in question were passed, were rendered competent by proof of their use within the indictment period.

"16. Correspondence, newspaper articles and pamphlets, antedating the statutes, but contemplating their passage, and declaring a purpose to violate and obstruct them when passed, were of course admissible as bearing directly upon criminal intent."

The remaining errors under the third general assignment, designated as 3A, 3B and 3D, are so related that they may be considered together. 3A is based upon the contention that the testimony of state's witnesses relative to various extrajudicial statements of persons who claimed to be members of this organization, but who were in no manner connected with this transaction or any of the parties to it, was hearsay evidence, of such prejudicial character as to constitute reversible error. This assignment comprises specific assignments 31 to 52. 3B is based upon the refusal of the court to permit defendants to introduce evidence of an official member as to the attitude, teachings and practices of the organization, relative to the prohibited doctrines, and comprises specific assignments 52 to 59. 3C has just been considered, and 3D relates to the refusal of the court to permit defendant to introduce exhibits 1 and 3, referred to in specific assignments 60 and 61.

The state offered a large number of witnesses, who were permitted to testify as to conversations had with various persons, in widely scattered localities, and covering a long period of time, who were not in any manner connected with this action or any of the parties to it, but who stated, according to the testimony of these witnesses, that they were members of the Industrial Workers of the World, and pretended or attempted to give such witnesses a statement of the teachings, doctrines and practices of the order. Testimony of this general character covers pages from 199 to 412 of the record, and is so clearly hearsay evidence that unless some reason can be advanced or some authority found to

show that the age-old rule which excludes hearsay evidence and makes its admission reversible error cannot be invoked in the defense of an I. W. W., the admission of this testimony was reversible error, for it cannot be denied that it is hearsay of the clearest and most pronounced character. No reason has been given or authority cited even tending to show that the admission of this hearsay evidence should be permitted in prosecutions for this class of offenses, as an exception to the universal rule that it is inadmissible in the prosecution of all other crimes. We have made a diligent search of the authorities in an effort to find some reason or authority upon which its admission in this case could be sustained, but fail to do so\ The late decisions in similar prosecutions under like statutes hold this class of testimony to be hearsay, and to constitute reversible error.

In *State v. Lowery, supra,* the defendant offered the testimony of a witness that members of a mediation committee, an unofficial organization appointed by the President of the United States to investigate the cause of labor unrest, had discovered and reported that the Industrial Workers of the World was not in fact an anarchial organization, but the court rejected this class of testimony, saying:

"It is certainly not permissible for a witness on the stand to testify as to what someone else, even though cloaked with the title of mediation commissioner, may have thought from his investigation of the Industrial Workers of the World, as to their doctrines. This violates all the rules of hearsay testimony."

In *State v. Gibson,* 115 Wash. 512, 197 Pac. 611, decided April 22, 1921, the court set aside a conviction under a statute similar to our own for the admission of this class of hearsay testimony. The reasoning of the court in that case upon the precise question here presented is so well stated that we adopt it as a correct statement of the law in this case upon that question:

"This was hearsay testimony, and in our opinion the trial court erred in receiving it. Some of the reasons why hearsay evidence is not ordinarily admissible are: that the

person quoted is not before the court and not subject to cross-examination, a right which all courts have held to be inviolate except in certain instances arising largely because of the necessities of the situation; that the person quoted was not under oath; and the probability that the person testifying has misunderstood, misinterpreted or colored what had been told him. In other words, hearsay evidence is ordinarily refused by the courts because of the manifest inherent dangers in connection with it. There are certain exceptions to this general rule, such as dying declarations, res gestae, proof of ancient boundaries and documents, and others. But this testimony does not come within any of the exceptions recognized by the authorities. The dangers surrounding the admission of hearsay evidence are very apparent in this instance. It is true the witnesses testified that the persons whom they quoted told them that they were members of the I. W. W., and in a position to know the objects and purposes of that organization; but those were very important facts to the appellants. It may have been that the persons quoted were not members of that organization, or had obtained their membership cards through some species of fraud, or were not acquainted with the principles taught by it. The appellants should have the right to search out these matters by means of cross-examination.

"Again, it is not improbable that the witnesses had misunderstood or misinterpreted what the person quoted had said to them. There was no compelling necessity in this case to show by hearsay testimony the principles and doctrines taught and advocated by the I. W. W. There were other ways of proving these things. Indeed, the state introduced in evidence for this purpose a large amount of literature showing the doctrines of the organization, and which literature the state contended was vouched for by the I. W. W. as an organization. It is probable that the persons quoted, to wit, Hannon and the Roi sisters, had they been personally called by the state, would have been permitted to testify upon a proper showing of knowledge, but it will not do to have them testify through some one else. The respondent

cites in support of this testimony the rule with reference
to the receiving of testimony in conspiracy cases, but that
rule is wholly inapplicable here. This testimony was not
offered or received for the purpose of proving any con-
spiracy, nor were the persons who were quoted in anywise
connected with this case, either directly or indirectly."

Jones in his work on Evidence, sec. 297 (299, 300), be-
gins his discussion of hearsay evidence by quoting from an
early authority as follows:

" 'There is a great head of the law of evidence, compris-
ing, indeed, with its exceptions, much the largest part of all
that truly belongs there, forbidding the introduction of
hearsay. . . . . By this is meant that kind of evidence which
does not derive its value solely from the credit to be attached
to the witness himself, but rests also in part on the veracity
and competency of some other person from whom the witness may have received his information. Such testimony—
sometimes well called second-hand testimony—is excluded as
being hearsay, as being that which is based on what someone
else, not a party to the action, nor an agent of the party, nor
in the hearing of the party, has said, and to which that
someone else could testify directly if a witness, and himself
stand the cross-examination which might establish or destroy
its value. The leading case in this country (*Mima Queen v.
Hepburn*, 7 Cranch (U. S.), 290, 3 L. ed. 348), lays down
the law with certainty. The syllabus says that 'Hearsay
evidence is incompetent to establish any specific fact which
is, in its nature, susceptible of being proved by witnesses
who speak from their own knowledge.' And in that case
Chief Justice Marshall, delivering the opinion of the court,
said: 'It was very justly observed by a great judge that
"All questions upon the rules of evidence are of such vast
importance to all orders and degrees of men; our lives, our
liberty, and our property are all concerned in the support of
these rules, which have been matured by the wisdom of ages
and are now revered for their antiquity and the good sense
in which they are founded." One of these rules is that
hearsay evidence is in its nature inadmissible. That this

species of testimony supposes some better testimony which might be adduced in the particular case is not the sole ground for its exclusion. Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is totally inadmissible.' "

The witness Tyler was offered by the state and permitted to testify that in the winter of 1916–1917, and prior to this act becoming effective, he worked in Camp No. 7, where there were something like 90 men, nearly all of whom were I. W. W.'s; that one of them told him that "they wanted the eight-hour work day, and I had an argument with them. I asked them if they had the eight-hour day if they would be willing to do that. They said as soon as they had the eight-hour day they would have the seven-hour day and as soon as they got that working they would have the six-hour day. I says, 'What is the idea?' They says, 'The idea is to break the lumber companies and make the lumber our own selves. . . . .' " Again the witness Tyler testified that a man who was supposed to be an organizer stated to the witness in a conversation in 1916 or 1917 that he, the witness, would have to join or get out.

Bradley, a witness for the state, testified that a man by the name of Williamson said to him that "they [meaning the I. W. W.'s] are going to take the lumber industry from the lumber barons, as they call them, and divide it up."

Pyatt, another witness for the state, testified that he had heard them advocate "the cutting of short logs, cutting different lengths, so it would not make the length."

The witness Oblisero testified that when he was fighting a forest fire a water-boy asked him if he "had a red card, and I says 'No.' 'Well,' he says, 'that is too good for you fellows to have to drink. This is only for wobblies.' " Again, in the Miners' Hall in Wallace, Idaho, a Slav whom the witness thought was an I. W. W. said concerning a red card: "He said, 'That is going to rule the world, to rule the government, that is going to be the government.' I told

him he would not live long enough to get it through by war. He said, 'We'll get ahead of these fellows pretty quickly when we get organized. Look at Russia. Look what Russia is doing. The people have everything in their hands now.' "

The witness Daniels testified that in a conversation with some men who had cards in the I. W. W., in March, 1917, they said to him: "Better join the organization or get out of camp. They said I had to join or leave in four or six days." The witness was asked: "Did you hear any members of the I. W. W. at any other place talking about teaching sabotage?" and answered, "They said cut short logs."

The witness Olson testified that he heard a man say about an old friend who drove a team: "Join or get out of here. They said they would burn his blankets if he did not join." He was further asked: "Tell what any of the men said about what the I. W. W. was going to do. Did they say anything about how they were going to work and what they were going to do?" He answered: "They were going to run the works themselves."

The witness Lanterdahl testified on behalf of the state concerning a conversation with men whom the witness stated were members of the I. W. W., at Clark's Fork, Idaho, wherein they said: "We are going to organize into a full union. Down with the capitalists and up with the laborers."

The witness Mitchell testified to the substance of statements made by more than one I. W. W. in the state of Washington, that "None of them believed in this form of government. They believed in the overthrow of this government, and run it to suit themselves. The work for the workers, and this change would come about peaceably, but if not, they would make it come about anyway."

The foregoing does not give the most objectionable language said by these witnesses to have been used by persons in widely scattered communities throughout the states of Montana, Idaho and Washington, whom the witnesses supposed were I. W. W.'s, but it is sufficient to show the objectionable character of this evidence. None of the persons

who are alleged to have thus spoken were in any manner connected with the case on trial, nor did the witnesses testifying claim to have related the conversations had with such persons, or pretend to give more than his conclusion as to what such person said the doctrines, teachings and practices of the I. W. W. were. Such persons' purported statements as to the teachings, doctrines and practices of this organization were not given under the sanctity of an oath. They may or may not have been members of the order, and acquainted with its teachings and doctrines. They may have been misunderstood by the witness who pretended to relate what they said of it, or they may have been misquoted by such witness, who gave only his version of what was said. The purported statements of a great number of persons, many of whose names were not even known to the witness claiming to relate the conversation, were in this indirect manner put into the record against the defendant, thus violating the constitutional right of the defendant to be confronted by the witnesses against him, and to have an opportunity to appear and cross-examine them. To all of this class of testimony objection was made, and after its admission a motion was made to strike the same, which was denied.

The state strenuously insists that this testimony was admissible, and relies in part upon the case of *People v. Roe,* 58 Cal. App. 690, 209 Pac. 381. An examination of that case shows that instead of being an authority in support of the state's contention, the converse is true. At page 385 of 209 Pac. (58 Cal. App. 690) there is an extended quotation from *People v. Steelik, supra,* wherein the following language is approved:

"The evidence adduced in court by the coconspirators as witnesses are not declarations of conspirators, but direct testimony to the facts to which they testify. Aside from the discredit which attaches to them as accomplices, their evidence is entirely competent to establish the facts to which they testify. The rule for which counsel contends is appli-

cable only when it is sought to introduce extrajudicial declarations and statements of coconspirators.''

After the state rested, the defense called witness John Grady, who attempted to qualify himself by stating that he was a member of the Industrial Workers of the World, secretary and treasurer of the defense committee, secretary of the northwest district, which is the Spokane district, that he was a delegate to the 11th I. W. W. convention in Chicago, and while there met and talked with all the officials and delegates attending that convention, and that he had read and studied the literature of the organization. The defense then offered to prove by the witness that as an official of the defense committee, he was familiar with the purposes of the Industrial Workers of the World in circulating such pamphlets as Tridon's ''New Unionism'' and Haywood's ''General Strike,'' and that the purpose was educational and to invite discussion, and not for the purpose of advocating violence or sabotage, which offer was excluded on the ground that a member of the organization cannot testify what are the purposes of the organization. The witness was further asked with regard to the debates in the Chicago convention relative to Flynn's ''Sabotage,'' Pouget's ''Sabotage,'' and Smith's ''Sabotage,'' and further as to the attitude of the organization, or what had been said by its members, with regard to the subject of violence, to which counsel for the state objected as calling for a conclusion of the witness, being too indefinite, and that the position of the organization could not be shown by the individual opinion of its members, which objection was sustained. The witness was further asked as to whether or not the organization advocated violence, to which objection was made and sustained on the ground that the witness had not been shown competent to testify.

Notwithstanding the official character of this witness and the showing made with regard to his special qualifications, which would tend to acquaint him with the objects of the organization, it may be that under a strict application of the

rule of hearsay and the rule calling for the best evidence, the testimony was properly excluded. But we are unable to conjecture why or upon what conceivable theory counsel for the state could contend that this testimony was not admissible, and maintain that the character of testimony above related, offered by the state and received over defendant's objection, was competent. Surely it cannot be that the state may successfully offer this class of testimony in the prosecution of persons charged with a felony, and then insist that such persons are prohibited from meeting this class of testimony by witnesses who show themselves in some degree at least qualified to speak concerning the objects and teachings of the order.

Subdivision 3D predicates error upon the refusal of the court to admit in evidence defendant's exhibits 1 and 3. Among the several hundred exhibits appearing in the record in this case, we are unable to identify the particular exhibits referred to, and the description of these exhibits in connection with their offer is not sufficient to enable us to determine whether or not the same should have been admitted. It does appear, however, that they were of the same general character as the exhibits offered by the state, and that such exhibits were offered for the purpose of showing that this organization did not approve, or had modified its position with regard to, the doctrines promulgated by some of the exhibits of earlier date offered by the state. If such were the case, clearly the exclusion of this testimony was erroneous. In line with what has been said regarding the admission of hearsay evidence on behalf of the state and its exclusion on behalf of the defense, it cannot be contended that in a trial upon an information charging defendant with being a member of an organization that taught, advocated and practiced criminal syndicalism, the defense would not be permitted to meet the state's evidence in the way of numerous exhibits, which it claimed tended to establish such fact, by the introduction of similar exhibits which tended to rebut the state's evidence.

It is earnestly contended that notwithstanding the errors committed in the admission of this hearsay evidence, there is still sufficient competent evidence to sustain the conviction, and hence such error was without prejudice.

Where a conviction follows the admission of incompetent evidence, it is never possible for the court to say to what extent its admission influenced the verdict. A verdict should not be set aside for error unless it is clear that the defendant has not had a fair trial. In the instant case, the jury acquitted the remaining twenty-two persons jointly informed against and tried with defendant, although the evidence against them was substantially the same, except that they were not shown to be organizers. In view of the highly inflammatory nature of this hearsay evidence, and the large number of witnesses who were permitted to testify, and all the surrounding circumstances, it cannot be presumed that its admission was harmless.

Furthermore, this court should not lend its sanction to the making of an exception disregarding and setting aside a rule of law so ancient, fundamental and important as the rule against the admission of hearsay evidence, which would thereby make the teachings, doctrines and character of every civic, religious or political organization the subject of attack upon its good name and character by any irresponsible person who sought to malign it.

Courts are governed by the limitations and restrictions imposed by law, and they cannot in its administration sanction or uphold that which has not been done in accordance with its settled principles. If it were otherwise, they would exercise a mere autocratic power to arbitrarily uphold or set aside a conviction for crime, irrespective of the settled rules of procedure. They are not clothed with that power, but must extend to every person charged with crime the equal protection of the law.

The judgment should be reversed and a new trial awarded. It is so ordered.

Wm. E. Lee, J., and Varian, District Judge, concur.

BUDGE, C. J., Concurring in Part and Dissenting in Part.—I concur in that part of the opinion written by Justice William A. Lee and concurred in by the majority of the court, upholding the constitutionality of the law under which this prosecution was had, and also in sustaining the sufficiency of the information, but I am entirely out of accord with that portion of the opinion reversing the judgment upon the ground that the trial court erred in admitting what is denominated in the majority opinion as "hearsay testimony."

First briefly calling attention to what is denominated hearsay testimony of such an inflammatory character that is held in the majority opinion to justify the reversal of the judgment, the witness Tyler was permitted to testify that in the winter of 1916–17 and prior to the time the act under which this prosecution was had became effective, that he worked in Camp No. 7 where there were something like ninety men, nearly all of whom were I. W. W.'s; that one of them told him that "they wanted the eight-hour work day. . . . . I says, 'What is the idea?' They says, 'The idea is to break the lumber companies and make the lumber our own selves.' " Tyler further testified that a man, supposed to be an organizer, stated to him in a conversation in 1916 or 1917 that he, the witness, would have to join or get out.

The witness Bradley testified that a man by the name of Williamson said to him that "they [meaning the I. W. W.'s] are going to take the lumber industry from the lumber barons, as they call them, and divide it up."

Pyatt, another witness for the state, testified that he had heard them [meaning the I. W. W.'s] advocate "the cutting of short logs, cutting different lengths, so it would not make the length." The witness Oblisero testified that when he was fighting a forest fire a water-boy asked him if he "had a red card, and I says 'No.' 'Well,' he says, 'that is too good for you fellows to have to drink. This is only for wobblies.' " Again, in the Miners' Hall in Wallace, Idaho, a Slav whom the witness thought was an I. W. W. said con-

cerning a red card: "He said, 'That is going to rule the world, to rule the government, that is going to be the government.' I told him he would not live long enough to get it through by war. He said, 'We'll get ahead of these fellows pretty quickly when we get organized. Look at Russia. Look what Russia is doing. The people have everything in their hands now.'"

The witness Daniels testified that some men who had cards in the I. W. W., in March, 1917, said to him: "Better join the organization or get out of camp. They said I had to join or leave in four or six days." The witness was asked: "Did you hear any members of the I. W. W. at any other place talking about teaching sabotage?" and answered, "They said cut short logs."

The witness Olsen testified that he heard a man say about an old friend who drove a team: "Join or get out of here. They said they would burn his blankets if he did not join." He was further asked: "Tell what any of the men said about what the I. W. W. was going to do. Did they say anything about how they were going to work and what they were going to do?" He answered: "They were going to run the works themselves."

The witness Lanterdahl testified on behalf of the state concerning a conversation with men whom the witness stated were members of the I. W. W. at Clark's Fork, Idaho, wherein they said: "We are going to organize into a full union. Down with the capitalists and up with the laborers."

The witness Mitchell testified to the substance of statements made by more than one I. W. W. in the state of Washington, that "None of them believed in this form of government. They believed in the overthrow of this government, and run it to suit themselves. The work for the workers, and this change would come about peaceably, but if not, they would make it come about anyway."

While it is true, as above set out, that the state offered a number of witnesses who were permitted to testify as to conversations had with various persons that were members of the Industrial Workers of the World, and which witnesses

repeated statements made to them by I. W. W.'s with whom they conversed, the defendant was not denied that right and in fact exercised the privilege of introducing like testimony. For instance, witness Grady was asked by counsel for the defendant: "What is the attitude of the organization, or what has been said by members of the organization, or whom you have some reason to believe were, with reference to the subject of violence?" To this question counsel for the state interposed an objection. The court, in passing upon the objection made the following ruling: "I sustain the objection as far as it calls for the opinion of this witness as to the attitude of the organization. As to what he heard members say on those occasions as to the practice of violence he may testify."

In ruling upon a like objection the court said: "I will let him state what he heard other members state as to violence."

Again, the court made the following pertinent ruling: "I think that under the rule the court has laid down in the state's testimony he [Grady] would have the right to give the statements of any of the officers — any national officers or individual members—private members, as to how they felt in regard to the practice of violence."

No less than six times during the examination of this witness did the court state in positive terms that the witness would be permitted to testify to what he had heard other members state as to the practice of violence.

The witness Grady also testified: "All I have heard say anything about violence [meaning I. W. W.'s] would be to discourage it and not pay any attention to anyone who advocated violence."

The witness was further permitted to testify as to certain resolutions passed by the convention to have all the old literature revised and only that part republished which dealt with the industrial situation for the purpose of showing that the I. W. W. did not teach, advocate or countenance acts of violence. The only restriction laid by the court upon the

testimony of the witness Grady or witnesses for the state was that they would not be permitted to testify as to what the organization taught but they would be permitted to express their own sentiments on that subject and to testify as to what members of the I. W. W. had said with reference to violence or in opposition to the commission of acts of violence in bringing about industrial reform.

The witness, Klauss, called on behalf of the defendant, after testifying that he was acquainted with men who claimed to be I. W. W.'s, who held cards and for whom he had paid dues, among other things, in answer to the following question: "What did they say about violence?" stated: "I never heard them say anything about violence any more than when they would read anything in the paper they would talk about it. I heard this conversation where they thought it was not the I. W. W. that done this." He was asked: "Have you ever had any experience with them practicing sabotage or violence while they were working for you," to which he made answer: "No, sir, I have not," and in reply to the question: "Did they appear to slow up or urge slowing up on the job?" answered, "No, sir, I don't think I know of one single case." Again he was asked the following question: "Have you had any trouble with short logs?" to which he replied: "No, sir." He was asked how many I. W. W.'s he had employed during the last few years and he answered: "I have employed in the neighborhood of 12 or 15 in the last 2 or 3 years."

The witness McGreggir, called on behalf of the defendant, testified that he was foreman of a mine and employed from 60 to 130 men and had occasion to employ members of the I. W. W. He was asked the following question: "I will ask you if you ever had any trouble from the men practicing sabotage in the mine?" He answered: "I never did," and continuing, the witness stated: "I never heard them [meaning the I. W. W.'s] mention violence or anything; of course they were all in favor of strikes and methods of that kind. They believed in industrial effort, you know." He was then asked: "Did these men ever advocate violence to your knowl-

edge at the mine?'' to which he replied: ''No, sir, I have never heard them express themselves as though they were in favor of it,'' and in answer to the question: ''Did you ever hear them express themselves as being against it?'' the witness replied: ''Well, I have often heard them say that they could not win anything that way.''

Numerous other instances may be pointed out where the defendant's witnesses were permitted to state what was said by I. W. W.'s. However, it will be noted that neither witnesses for the state nor defendant were permitted to testify what the practices, teachings or doctrines of the organization were and in this respect, if I read the majority opinion correctly, a proper distinction was not drawn touching the nature of the testimony admitted by the trial court. The trial court did not permit the state to introduce objectionable testimony along this line and refuse to the defendant the same privilege. While two wrongs do not make a right, where two have committed the same wrong neither can seriously complain. As was said in the recent case of *People v. LaRue* (Cal. App.), 216 Pac. 627, 630:

''While a court should carefully guard against the admission of hearsay evidence, in a case where so wide a range of evidence is permissible for the purpose of proving the character of an organization, some improper evidence usually creeps into the record, but in this case the hearsay evidence admitted is comparatively, as said in the anarchists' case (*Spies v. People,* 122 Ill. 1, 3 Am. St. 320, 12 N. E. 865, 17 N. E. 898), 'so inconsiderable that it could not have in any way injured' the defendants.''

An examination of the record discloses the fact that numerous errors committed and complained of relate to the proof of the unlawful character of the organization. The proof thereof is so overwhelming that an examination of the whole case not only fails to show a miscarriage of justice, but affirmatively shows that a reversal would constitute a miscarriage of justice.

In the case of *People v. Roe,* 58 Cal. App. 690, 209 Pac. 381, which was afterwards affirmed by the supreme court of

the state of California, in 189 Cal. 548, 209 Pac. 560, it is held: "In such a prosecution testimony of ex-members of the I. W. W. as to the principles advocated by the organization and its activities for several years in carrying out such principles by violent means is admissible as tending to disclose the character of the organization."

This case would seem to fall squarely within the rule announced in the case of *Stephens v. Loudermilk,* 9 Ga. App. 608, 71 S. E. 1004, where a witness testified as to the conduct of a dog, and referred to this dog as the defendant's dog. The witness further said that he knew that it was the defendant's dog, because he had seen it at another person's house, and that person had told him that it was the defendant's dog. The court held that: "While standing alone, this testimony would have been hearsay and inadmissible, still it became competent, when it was supplemented by the testimony of the person at whose house the dog was seen to the effect that the dog which was seen there, and which he had told the other witness was the defendant's dog, was in fact the defendant's dog."

The record, which is voluminous, establishes by competent evidence defendant's guilt as charged in the information beyond the possibility of a doubt and this is true independently of the alleged hearsay testimony which, as will be seen upon an examination of the record, is largely a reiteration of the documentary evidence correctly held in the majority opinion to have been properly admitted. Not only did the oral testimony but the documentary evidence establish beyond cavil the character of the organization itself but further established beyond controversy that the organization taught, as a means of industrial reform, the destruction of life and property as well as the overthrow of the government, the undermining of all governmental institutions and the bringing about of a general chaotic condition.

Even admitting, for the purpose of argument, that this testimony denominated hearsay was in fact such, the correct rule is that the admission of hearsay testimony does not constitute a ground for reversal where the matter as to which

37 Idaho.—19

the hearsay evidence was admitted was established by other evidence which was competent. There is no rule of law more firmly established in our jurisprudence than that the admission of hearsay testimony constitutes no ground for the reversal of a judgment of conviction where the matter as to which the hearsay evidence was admitted was established by other evidence which was competent. (17 Corpus Juris, sec. 3675, p. 332, note 59.)

In the case of *Knight v. State,* 64 Tex. Cr. 541, 144 S. W. 967, the principle of law above referred to is well stated, where it is held: "In a prosecution for seduction where the pregnancy of prosecutrix was uncontroverted, the admission of evidence of her hearsay statements to that effect was not prejudicial."

To like effect are the cases of *Valigura v. State,* 69 Tex. Cr. 320, 153 S. W. 856, and *State v. Hunter,* 89 S. C. 136, 71 S. E. 823.

In the case of *State v. Hassan,* 149 Iowa, 518, 128 N. W. 960, the court held that it was not error to allow a witness to testify that he heard his brother say it was a certain time when he was talking with defendants where the brother testified what time it was.

Also in the case of *Parker v. State,* 91 Tex. Cr. 68, 238 S. W. 943, in a prosecution for murder, evidence that deceased told his father that he was going to a certain address to get a party, although hearsay, was admissible as showing the design of a deceased person, and the fact that deceased called for the accused and others at that address being in evidence, from other sources, its admission if error, was harmless.

The general rule as to this character of evidence may be found in 8 California Jurisprudence, sec. 599, p. 615, where it is said that: "Error in the admission of evidence is harmless if the evidence . . . . is proved by other evidence which is admitted without objection."

This court, in the case of *State v. Black,* 36 Ida. 27, 208 Pac. 851, in discussing this principle, lays down the following rule: "Error in overruling an objection to the admission

of evidence is harmless, where the same matter sought to be elicited by the question is subsequently received in evidence without objection.''

Throughout the entire record it was admitted that the defendant was not only a member of the organization known as the I. W. W.'s but that he was an active organizer and necessarily distributed the literature of the organization setting forth its doctrines and doubtless advocated such doctrines at its public meetings and in private conversations. Numerous overt acts of lawlessness such as would be inspired as a result of the teachings of the organization were shown to have been committed by men who were proven to be connected with the organization and who had upon their persons evidence of membership. The literature distributed by the various organizers, of which the defendant was one, conclusively shows that the purposes of the organization are treasonable in nature. The members of the organization are not in sympathy with our established form of government, claiming that it is antagonistic to the laboring class and destructive of social welfare. The purposes of the organization and what it seeks to accomplish can be readily ascertained by the examination of the authorities cited in the majority opinion and particularly the cases of *State v. Moilen,* 140 Minn. 112, 167 N. W. 348, 1 A. L. R. 331; *State v. Breen,* 110 Kan. 817, 205 Pac. 634; *People v. Mallery,* 49 Cal. App. 597, 194 Pac. 48; *People v. Lesse,* 52 Cal. App. 280, 199 Pac. 46; *People v. Taylor,* 187 Cal. 378, 203 Pac. 85.

It would seem to me that the application of the rule of evidence as to hearsay testimony of the character discussed, when expressly limited for the purpose of proving the character of the organization and when not admitted for the purpose of convicting the defendant of an overt act, lends encouragement to the further growth of an organization having for its purpose the overthrowing of the government and the destruction of life and property.

The defendant is not charged with the commission of an overt act but is charged with being a member of an organiza-

tion known as the Industrial Workers of the World, formed to teach and advocate and which does teach and advocate the doctrine of criminal syndicalism, sabotage, violence and unlawful methods of terrorism as a means of accomplishing industrial and political reform, and of this offense he was clearly proven to be guilty.

All of the alleged hearsay evidence may be stricken from the record and still there remains volumes of positive and competent proof clearly establishing the character of the organization to which the defendant admittedly belonged. The jury, in keeping with its solemn duty, could have reached no other conclusion than it did under the evidence in this case. The judgment of the trial court should be affirmed.

McCARTHY, J., Dissenting.—I concur in the majority opinion as to the constitutionality of the law and the sufficiency of the information. I dissent from the conclusion reached.

The alleged errors in regard to the admission of evidence may be divided into two classes. The first class consists of errors in admitting evidence of acts and statements of individuals claimed to have been members of the I. W. W., the only proof of their membership being their extrajudicial statements to that effect. In my judgment this was clearly error. The extrajudicial statement of an individual that he is a member of an organization is not, as against that organization or its members, any proof of that fact. It is hearsay pure and simple. It is admissible only against himself, in which case it is an admission. The case falls within the same rule which excludes from evidence the extrajudicial statements of an alleged agent to prove the agency, or of an alleged partner to prove the partnership. There should be no relaxation of the hearsay rule in such cases. If such evidence were admitted, any organization would be at the mercy of unidentified individuals who might say that they

were members, and then make statements or commit acts damaging to its reputation.

The second class of alleged errors comprises the rulings of the court in admitting acts and statements of individuals as members of the organization, as to whom there was some competent evidence to prove such membership. A narrative statement of a member as to something which has occurred in the past is hearsay and inadmissible. A mere statement of opinion by a member as to the purpose or objects of the organization is inadmissible because, if not purely hearsay, it is objectionable as a conclusion. Acts of individual members of an organization, including statements which are verbal acts rather than mere narrative statements, are not hearsay. They may in certain cases have great probative value. If we find all, or a large part of, the individual members of an organization committing certain acts or making certain statements, under circumstances which show a common understanding or concert of action, this is certainly evidence tending to show that the organization approves and encourages the committing of such acts and the making of such statements. As I understand it, hearsay evidence consists of extrajudicial statements as to the fact in issue. The extrajudicial statement of an individual that he is a member of an organization is hearsay evidence of his membership. The acts of members of an organization, which tend to show the practices and therefore the teachings of that organization, are not hearsay evidence of its teachings. If such evidence is not admissible it may be impossible in certain cases to prove what those teachings are. Organizations which cannot stand the test of publicity soon learn to operate in secret. They do not publish their constitution and by-laws and have no official literature. Their officers learn to be careful about their public utterances. The instructions are given verbally and pass from individual to individual. I think that the best evidence rule applies, and the best evidence in the first instance consists of the written constitution and by-laws, official literature, and official utterances of the officers, if such exist and are available. It is entirely

possible, however, that the official literature might be unobjectionable, and published merely as a blind, and that the real teachings of the organization might be represented by instructions privately circulated to the individual members. In such case these private instructions would certainly be admissible. Ordinarily I would say that the trial judge should apply the best evidence rule, and should confine the prosecution to evidence of the constitution, by-laws, literature and official acts and utterances if available. If they are not available, or if there is evidence that they do not represent the real teachings of the organization, then I think that instructions passed from individual to individual member, and the individual actions of the members should be admissible, if they are of a similar nature, and cover a wide enough range and sufficient instances, so that a common understanding and concert of action may be inferred. "By their fruits ye shall know them." Surely the widespread practice of sabotage by the members of an organization would be evidence that the organization approved and encouraged it. In the instant case it seems to me that the official literature and utterances, as shown by the exhibits introduced by the prosecution, clearly show the teachings of the organization, and there was no reasonable cause for resorting to evidence of the individual acts. The trial court should have invoked the best evidence rule and confined the prosecution to evidence of the first class.

I conclude that the trial court committed error in admitting evidence of acts and statements of individuals upon the assumption that their extrajudicial statements were proof of their membership in the I. W. W. I think there are also some errors in admitting the evidence of acts and statements of individuals, who were shown by competent evidence to be members of the I. W. W.

The question is whether such errors are ground for reversing the judgment.

"Erroneous admission of evidence and an accompanying erroneous statement by the court are not reversible error, when the verdict of guilty is sustained by other evidence,

clear and uncontradicted, so that the jury could not have reached any other conclusion.'' (*State v. Petrogalli,* 34 Ida. 232, 200 Pac. 119.)

"It must be concluded from the entire evidence in this case that the jury did not base its verdict upon the exhibit improperly admitted in evidence, but did base its verdict upon the competent and relevant evidence introduced.'' (Ibid.)

To my mind, the exhibits introduced on behalf of the prosecution, particularly the official literature and utterances, show beyond shadow of doubt that the I. W. W. is a society formed to teach and advocate, and which does teach and advocate, the doctrines of criminal syndicalism, to wit, the doctrines which advocate crime, sabotage, violence and unlawful means of terrorism, as a means of accomplishing industrial and political reform contrary to the statute upon which the indictment is based. There is no evidence in the record which meets or offsets this evidence. There is sufficient competent evidence to show that appellant was a member and organizer of the I. W. W. Assuming, as we should, that the jury was composed of men of at least average intelligence and integrity, I conclude that it could not have reached any other conclusion, that the verdict was based upon, and is justified by, the competent evidence. I therefore conclude that the errors complained of in the admission of evidence are not prejudicial and therefore not reversible, and that the judgment should be affirmed.