(January 11, 1924.)

In the Matter of the Application of RICHARD MOORE for a Writ of Habeas Corpus.

[224 Pac. 662.]

CRIMINAL SYNDICALISM—SABOTAGE—STRIKING ON THE JOB—STATUTES —CRIMINAL OFFENSE—LEGISLATIVE INTENT.

1. *Held*, that by the use of the word "sabotage" in the criminal syndicalism law, the legislature of this state did not include striking on the job.

2. An act cannot be held criminal under a statute unless it clearly appears from the language used that the legislature so intended.

Petition for writ of *habeas corpus. Petitioner discharged.*

William Healy, for Petitioner.

The term "sabotage" as used in the Idaho criminal syndicalism law is restricted to such meaning or meanings only as constitute unlawful acts, viz., damage or destruction of property. The rule *"noscitur a sociis"* requires such construction. (*State v. Aspelin,* 118, Wash. 331, 203 Pac. 964; *State v. Tonn,* 195 Iowa, 94, 191 N. W. 530; *State v. Dingman,* 37 Ida. 253, 219 Pac. 760.)

Every statutory definition of "sabotage" of other states limits its meaning to damage or destruction of property. (*State v. Dingman,* 37 Ida. 253, 219 Pac. 760; California, Henning Gen. Laws, p. 3281, sec. 1; Washington, Sess. Laws 1919, chap. 173, sec. 1; Oregon, Laws 1919, chap. 12, codified as sec. 2025; Utah, Laws 1919, chap. 127, sec. 2; Montana, Laws Sp. Sess. 1918, chap. 7, sec. 2 (codified sec. 10741, R. C. 1921); Minnesota, Laws 1917, chap. 215, sec. 1; South Dakota, Laws 1918, chap. 38, codified as sec. 3647, R. C. 1919; Kansas, Sp. Sess. 1920, chap. 37, sec. 21.) Judicial definitions are to the same effect. (*State v. Tonn,* 195 Iowa, 94, 191 N. W. 530; *State v. Moilen,* 140 Minn. 112, 1 A. L. R. 331, 167 N. W. 345.)

An interpretation of the word "sabotage" to mean something noncriminal and nonviolent, e. g., slowing down of work, would render the statute violative of both state and federal constitutions. (*State v. Gabriel,* 95 N. J. L. 337, 112 Atl. 611; *State v. Tachin,* 92 N. J. L. 269, 106 Atl. 145; *State v. Diamond,* 27 N. M. 477, 20 A. L. R. 1527, 202 Pac. 988; *Fox v. Washington,* 236 U. S. 270, 35 Sup. Ct. 383, 59 L. ed. 573.)

A. H. Conner, Attorney General, and Herman H. Taylor, for Sheriff Wm. F. Dunning.

The term "sabotage," as used in the Idaho law, is not restricted to such meaning or meanings as constitute unlawful acts, viz., damage or destruction to property. The rule *"noscitur a sociis"* does not require such construction. (*Brown v. Chicago-Northwestern, R. Co.,* 102 Wis. 137, 44

L. R. A. 579, at 587; *People v. Gitlow,* 195 App. Div. 773, 187 N. Y. Supp. 783.)

Neither statutory nor judicial definitions require such construction except those statutes wherein sabotage is limited, as in Minnesota, California and Oregon, or other states where the term is defined as such as "malicious damage or injury to the property of an employer," or the damage injury or destruction of real or personal property.

"If it is within the power of the legislature to declare that a given act when done constitutes a crime, then it is likewise within the power of the legislature to declare that to advocate the doing of such act is a crime." (*State v. Laundy,* 103 Or. 443, 204 Pac. 958, 206 Pac. 290; *Fox v. Washington,* 236 U. S. 270, 35 Sup. Ct. 383, 59 L. ed. 573.)

In *State v. Dingman* this court has adopted and approved definitions of sabotage, which include slowing down on the job, withdrawal of efficiency, loitering at work, retarding production, and the like. That case is decisive of the issues raised herein.

DUNN, J.—Petitioner was charged with criminal syndicalism, and after a preliminary examination was held to answer to the district court of Bonner county. His application for a writ of *habeas corpus* is based on the claim that he was committed without reasonable or probable cause.

The statute under which petitioner is being prosecuted is as follows:

"Criminal syndicalism is the doctrine which advocates crime, sabotage, violence or unlawful methods of terrorism as a means of accomplishing industrial or political reform. The advocacy of such doctrine, whether by word of mouth or writing, is a felony punishable as in this chapter otherwise provided." (C. S., sec. 8580.)

"Any person who: . . . .

"4. Organizes or helps to organize or attempts to organize or becomes a member of or who, being a member thereof, continues or retains such membership or voluntarily assembles with any society, group or assemblage of persons formed

to teach or advocate, or which does teach or advocate, the doctrine of criminal syndicalism;

"Is guilty of a felony and punishable by imprisonment in the state prison for not more than 10 years or by a fine of not more than $5,000, or both." (C. S., sec. 8581.)

It is stipulated by the state and the petitioner that the evidence taken at the preliminary examination shows him to be a member of the I. W. W., and that the evidence on which the state relies to prove that the organization teaches the doctrine of criminal syndicalism consists of three exhibits attached to the petition, two being copies of minutes of Picket Camp, and the third a leaflet entitled "Three Kinds of Strikes." The latter is the one exhibit of importance in this case, and of this the material portion is that relating to "the strike on the job." This leaflet reads as follows:

### "Three Kinds of Strikes.

"The only purpose, or object, that a real union of lumberjacks can have is to serve to better the life conditions of the members of the union. The strike, as labor history fully proves, is the only method a union has to gain more wages, shorter hours and improved conditions.

"If the workers of the lumber industry are organized into the I. W. W., and organized 100% on the job, the necessity of striking would cease as the bosses would grant the demands made rather than foot the bill for a strike, they would most evidently be bound to lose, provided of course, that the workers had sufficient control of the unemployed.

"The lumber workers, although strongly organized in the Northwest, do not control all of the unemployed and are not organized 100% on the job in the entire lumber industry of the country. So the strike must be relied on to establish something like decent conditions in the lumber camps of the Northwest, and elsewhere. As we examine into the matter of strikes, we see that there are three well defined methods of striking, each method being adapted to certain conditions that may exist in an industry.

"First. The Industrial Strike. In this form of strike the intention is to include everybody working in the industry or in a territory that includes a heavy fraction of the industry. The Northwest woods and mills do not comprise the entire lumber industry, as there is timber especially in Wisconsin, Louisiana, Arkansas, Georgia and Maine, but the Northwest timber production is a major fraction of the total production and cannot be supplied by any or all of the other timber sections of the country, therefore, a strike in the Northwest that stops a heavy percentage of the timber production must win. It is worthy of note too, that the Northwest does produce a special kind of timber, not found elsewhere, especially lending itself to the requirements of large sized pieces.

"The length of time taken by such a strike depends on immediate conditions existing at the time, such as the percentage of men on strike, the number of unemployed on the slave market, the number of logs and the amount of lumber on hand, market prices, (supply and demand,) cheap transportation, the competition of substitutes for lumber, and finally and most important of all, the intelligence manifested by the strikers themselves, in the conduct of the strike throughout all of its many details.

"Second. The Intermittent Strike. When the workers are unorganized, except in a few camps, or when for any reason it is inadvisable to pull out an entire industry to correct abuses in a few camps, this strike is resorted to. An organization more than local in size is the first essential. The I. W. W. has branches, or at least delegates, in all towns and in every way we are prepared to co-operate with the strikers. When the crew of a camp strikes, the boss usually goes or sends to the nearest town for another crew. Active delegates and members being aware of the strike, should supply him with a union crew whose business it would be to stay on the job long enough to line up those who may have been left behind by the first crew and then strike for the same demands made by the first crew.

"Then the boss will decide to beat those tactics by going to Spokane, Portland or Seattle for his third crew. Here is where a widespread, active and intelligent union counts. When the first bunch leaves the camp they should immediately notify the big branches and headquarters of the Lumber Workers' Industrial Union No. 120, of the I. W. W., who in turn will relay the information through the papers and bulletins to the entire membership. Watchers must be kept in the slave market to spot the job when the employment shark hangs out a sign, or grabs men on the street. All efforts should be directed to see that the third crew is made up of members of the I. W. W. The boss will have to pay their fare 100 miles or so to the camp and commence operations again only to find that the third crew is on strike for the demands made by the first and second crews. If the boss remains obstinate for any length of time despite these methods, bankruptcy or insanity will end matters, though, usually, the workers will win without the necessity of supplying very many crews.

"Third. The Strike on the Job. During years of industrial depression and for some months of every year, the country swarms with millions of men looking for work. These men are to a great extent ignorant of unionism, and uneducated to their own class interests. Generally speaking they all harbor ambitions to be President of the United States, or a General in the army, and believe that the best and surest way of arriving at that pinnacle of success is to follow the teachings of their home town Y. M. C. A., which is to take the first job that offers, irrespective of wages, hours, conditions or strikes, etc. This type of human is easily induced to work on struck jobs; therefore, in times of great unemployment, a strike off the job is a risky proposition. In addition to this risk of wholesale scabbing, (that the miners and shopmen had to contend with during the past year), the lumber workers on strike would have difficulty in financing the strike, the difficulty being severe in proportion to the size of the strike and the extent of unemployment. All of this would involve hunger and privation,

that the strike on the job makes unnecessary. Also, why give the scab a job when union men can hold it and improve his conditions while working?

"The idea of the strike on the job is for the entire crew or as many of the crew as are organized to co-operate to do just as little work as they can possibly get by with. The technic of logging operations offers countless opportunities to delay work, and to slow down on the entire process of the lumber industry. If the boss discharges a crew it should be a simple matter to supply him with another union crew who will repeat the process. The wider spread this strike becomes the more effective it will be. If the morality of slowing down on the job troubles the ethical mind of the sensitive unorganized worker, just tell him the truth, which is that if the worker was to draw a full day's pay for only one hour's work a day the boss would even then be paying no more than the one hour's work is really worth. In the other seven, eight or nine hours' work the worker produces wealth that becomes dividends to the banker, profits to the boss and campaign funds and graft for the politician.

"To put any of these strikes into successful operation requires organization such as the I. W. W. alone is offering the workers of America and so, Friend Reader, if you want more wages, shorter hours and better job conditions, you will have to join us, and the sooner the better. 'Eventually, why not now?' The initiation fee is $2 and dues are only 50¢ for each month. There are delegates and branches of the Lumber Workers' Industrial Union, No. 120, of the I. W. W. everywhere you go and you can write to us at the following address:

"Lumber Workers' Industrial Union No. 120.

"Industrial Workers of the World.

"1001 West Madison Street, Chicago, Ill."

On the back of this leaflet is printed the preamble of the Industrial Workers of the World, as follows:

"The working class and the employing class have nothing in common. There can be no peace so long as hunger and want are found among millions of working people and the

few, who make up the employing class, have all the good things of life.

"Between these two classes a struggle must go on until the workers of the world organize as a class, take possession of the earth and the machinery of production, and abolish the wage system.

"We find that the centering of management of the industries into fewer and fewer hands makes the trade union unable to cope with the ever growing power of the employing class. The trade unions foster a state of affairs which allows one set of workers to be pitted against another set of workers in the same industry, thereby helping defeat one another in wage wars. Moreover, the trade unions aid the employing class to mislead the workers into the belief that the working class have interests in common with their employers.

"These conditions can be changed and the interest of the working class upheld only by an organization formed in such a way that all its members in any one industry, or in all industries if necessary, cease work whenever a strike or lockout is on in any department thereof, thus making an injury to one an injury to all.

"Instead of the conservative motto, 'A fair day's wage for a fair day's work,' we must inscribe on our banner the revolutionary watchword, 'Abolition of the wage system.'

"It is the historic mission of the working class to do away with capitalism. The army of production must be organized, not only for the every-day struggle with capitalists, but also to carry on production when capitalism shall have been overthrown. By organizing industrially we are forming the structure of the new society within the shell of the old."

The concrete question to be answered is whether slowing down on the job, or doing the smallest amount of work possible, is sabotage within the meaning of our statute, the advocacy of which for the purposes denounced by the statute constitutes criminal syndicalism. If so, then we think

it is not to be doubted that this leaflet teaches the doctrine of criminal syndicalism by teaching and advocating sabotage.

Since the statute does not define the word "sabotage," we must rely upon the recognized authorities for its meaning.

Webster's New International Dictionary defines sabotage as:

"a. Scamped work; b. Malicious waste or destruction of an employer's property by workmen during labor troubles."

Funk & Wagnalls' New Standard Dictionary gives this definition;

"3. Any poor work or other damage done by dissatisfied workmen; also, the act of producing it; plant wrecking."

Nelson's Encyclopedia, 1913, Vol. 10, p. 489, defines sabotage as "The organized hampering of production by slack work, skillful disabling of machinery, or the publication of trade secrets."

The New International Encyclopedia defines this word as follows:

"Sabotage may consist in throwing the progress of production out of order, through tampering with machinery, improper use of material, or loitering at work."

The former two definitions limit the meaning of sabotage to acts that result in injury to the employer's property, while the latter two cover not only acts that are injurious to property but such as do not directly affect property, but which may be damaging to the employer. These latter include slack work and loitering at work, which we understand to be equivalent to striking on the job, and the publication of trade secrets. Publication of trade secrets may be to the disadvantage or injury of the employer, but to the advantage or benefit of his customers, and it is hardly conceivable that the legislature had any intention whatever to make such an act criminal. Suppose an employee of a manufacturer discloses the methods by which such employer evades the provisions of the pure food law and sells to the public food products, so called, that are utterly unfit for human consumption, or makes known other pernicious practices that we have reason to believe are sometimes resorted

to by employers, can we say that the legislature intended to include such disclosures, however much they might injure the employer, in the meaning of the word sabotage? We think not. And yet, if we adopt the most comprehensive definitions of this word that have been given by writers of greater or less note, we shall be led to the necessity of declaring such acts criminal.

While we cannot say that striking on the job is as clearly outside of the meaning intended to be given to the word "sabotage" as such disclosures of trade secrets as we have mentioned would be, this fact is not sufficient to justify including it as sabotage. In order to bring striking on the job within the term sabotage and make its teaching criminal it must appear clearly and unmistakably that the legislature so intended, and this we are unable to hold.

In such a situation of uncertainty as to the meaning intended by the legislature by the use of the word sabotage we must follow the rule recognized as to criminal offenses, which is that before an act may be held by the courts to be a crime it must clearly and unmistakably appear that the legislature has made it so.

"There can be no constructive offenses, and before a man can be punished his case must be plainly and unmistakably within the statute." (*United States v. Lacher,* 134 U. S. 624, 10 Sup. Ct. 625, 33 L. ed. 1080; *United States v. Bathgate,* 246 U. S. 220, 38 Sup. Ct. 269, 62 L. ed. 676.)

"An offense is not punishable unless it falls within the condemnation of some penal statute. If it is not plainly and specifically within the act, it is not against law, and no conviction can be had thereunder. Its provisions are not to be extended by implication, and the act charged as an offense must be unmistakably within the letter as well as the spirit of the law." (*State v. Tufts,* 54 Mont. 26, 165 Pac. 1107; *State v. Lutey Bros.,* 55 Mont. 545, 179 Pac. 457.)

It must be borne in mind that we are not here considering the power of the legislature to make criminal the teaching of such reprehensible practice as striking on the job, or to

adopt as the meaning of sabotage the most comprehensive definition given by dictionaries or cyclopedias, but only the question whether by this statute it has done so.

Since it is not clear that the legislature did intend sabotage to include striking on the job we must hold that it is not so included. If this word is to be construed as embracing other acts ·than those included in the definitions given by Webster's New International and the New Standard Dictionaries, quoted above, it must be after the legislature, whose function it is to define crimes, has clearly and unmistakably so declared. Our statute, C. S., sec. 9444, declaring that ''The rule of the common law that statutes in derogation thereof are to be strictly construed, has no application to these compiled laws. The compiled laws establish the law of this state respecting the subjects to which they relate, and their provisions and all proceedings under them are to be liberally construed, with a view to effect their objects and to promote justice,'' does not authorize the courts, by a liberal construction of a statute, to include within it, as criminal, acts that are not clearly within its terms.

Before the petitioner can legally be held for trial before the district court it must appear that the acts shown by the record and on which the state relies constitute a crime. (C. S., sec. 8757.) If they do not, then there can be no showing that a crime has been committed, as required by this statute, and consequently no sufficient cause for holding the petitioner.

In this view of the matter, no reasonable or probable cause was shown for holding the petitioner, and it is ordered that he be discharged.

William A. Lee and Wm. E. Lee, JJ., concur.

BUDGE, J., Dissenting.—The writer undertook to prepare an opinion in this case and indulged the hope that it might become the majority opinion. However, a majority of the court take a different view. I have therefore concluded

to publish this opinion showing my reasons for not concurring in the majority opinion.

Petitioner applied to this court for a writ of *habeas corpus*. From the petition it appears that he was arrested upon a warrant issued out of the probate court in and for Boundary county, upon a complaint charging him with criminal syndicalism; that he had a preliminary examination before the probate judge, who as committing magistrate, made an order holding him to answer to the district court in and for said county upon the charge aforesaid, and was placed in the custody of the sheriff of Boundary county in default of bail. Upon the issuance of the writ the sheriff made return that he held petitioner in custody by virtue of the commitment aforesaid. It was stipulated by respective counsel for petitioner and the sheriff: (a) that the petitioner was held in custody by virtue of the commitment aforesaid upon the charge of criminal syndicalism; (b) that the only evidence material to a determination of this proceeding consists of certain documentary evidence, to wit: minutes of meetings of I. W. W.'s, a leaflet entitled "Three Kinds of Strikes" and the preamble and constitution of the Industrial Workers of the World; (c) that the Industrial Workers of the World had adopted the preamble and constitution and had circulated the leaflet entitled "Three Kinds of Strikes"; (d) that the minutes were those of meetings of members of the I. W. W.; (e) that petitioner was and is a member of the Industrial Workers of the World, and (f) that the foregoing facts were duly proven by competent evidence upon the preliminary examination.

The sole question here for determination is whether the evidence introduced was sufficient to show probable cause to justify the committing magistrate in binding petitioner over to the district court for the crime with which he was charged.

Criminal syndicalism is defined by C. S., secs. 8580 and 8581, as follows:

"Criminal syndicalism is the doctrine which advocates crime, sabotage, violence or unlawful methods of terrorism

as a means of accomplishing industrial or political reform.
The advocacy of such doctrine, whether by word of mouth
or writing, is a felony punishable as in this chapter other-
wise provided.''

''Any person who:

''1. By word of mouth or writing advocates or teaches
the duty, necessity or propriety of crime, sabotage, violence
or other unlawful methods of terrorism as a means of ac-
complishing industrial or political reform; or

''2. Prints, publishes, edits, issues or knowingly circulates,
sells, distributes or publicly displays any book, paper, docu-
ment or written matter in any form, containing or advocat-
ing, advising or teaching the doctrine that industrial or
political reform should be brought about by crime, sabotage,
violence or other unlawful methods of terrorism; or

''3. Openly, wilfully and deliberately justifies, by word of
mouth or writing, the commission or the attempt to commit
crime, sabotage, violence or other unlawful methods of
terrorism with intent to exemplify, spread or advocate the
propriety of the doctrines of criminal syndicalism; or

''4. Organizes or helps to organize or attempts to organize
or becomes a member of or who, being a member thereof,
continues or retains such membership or voluntarily assem-
bles with any society, group or assemblage of persons formed
to teach or advocate, or which does teach or advocate the
doctrines of criminal syndicalism;

''Is guilty of a felony and punishable by imprisonment
in the state prison for not more than 10 years or by a fine
of not more than $5000, or both.''

This discussion may be limited to the question only as to
whether petitioner was a member of an organization advo-
cating sabotage. That he was a member of the Industrial
Workers of the World is admitted. A determination is
therefore necessary as to whether or not the literature found
in his possession, namely the minutes of meetings of the
I. W. W. and the leaflet ''Three Kinds of Strikes'' teach
or advocate sabotage.

I will confine my attention to the leaflet, "Three Kinds of Strikes," which is set out in full in the majority opinion. It is petitioner's contention that unless the organization to which he belongs, and its publications, particularly the leaflet in question, teaches and advocates injury or destruction of property by violence, it does not teach sabotage in its statutory sense and there is no infraction of the law, while, on the other hand, it is contended that one who is a member of an organization which teaches and advocates the slowing down tactics, as outlined in the leaflet, is teaching and advocating sabotage in its statutory meaning and hence guilty of criminal syndicalism.

The general meaning of the word "sabotage" is determined in the case of *State v. Dingman,* 37 Ida. 253, 219 Pac. 760, 763, by reference to standard dictionaries. Webster's New International Dictionary, edition of 1913, defines "sabotage" as "Scamped work." It is defined in the Standard Dictionary of the same date as "any poor work or other damage done by dissatisfied workmen, also the act of producing it," and Nelson's Encyclopedia, edition of 1913, vol. 10, p. 489, gives it the following meaning: "The system used by certain working men in connection with or instead of a strike. It is defined as the organized hampering of production by slack work." The New International Encyclopedia says, among other things:

"Sabotage may consist in throwing the progress of production out of order, through tampering with machinery, improper use of material, or loitering at work."

It therefore follows that scamped work, poor work, slack work, loitering on the job, malicious waste and retarding production, all of which acts may be nonviolent, are included within the term "sabotage" as used in C. S., secs. 8580 and 8581, and a member of an organization teaching or advocating such acts is guilty of the crime of criminal syndicalism.

It is apparent that the leaflet teaches and advocates slack work, loitering on the job, poor work, retarding production, scamped work, the teaching and advocacy of which

would constitute sabotage within the meaning of the term as heretofore defined by modern lexicons and, in the absence of qualifying terms, would fall within the provisions of the two sections ‘above quoted and it will be presumed that the legislature used the word in that sense.

This court, in the case of *State v. Dingman, supra,* in failing to disapprove an instruction given by the trial court, in effect approved the same, in which instruction the term ‘‘sabotage’’ was defined in the following language:

‘‘You are instructed that the term ‘sabotage’ as used in the Idaho statutes in connection with the doctrine of criminal syndicalism means any unlawful and malicious damage or injury to property of an employer by an employee, or any unlawful or malicious slowing up on work or loafing on the job or withdrawing of efficiency by an employee for the purpose of causing injury or damage to the employer. The damage or injury may be caused by actually wrecking or destroying the employer’s property or by wilfully and purposely performing labor in such an inefficient or careless manner as to cause or result in damage or injury to the employer or his property, or in retarding production, or by any other wilful, malicious and intentional act or omissions on the part of the employee resulting in or intended to result in retarding production or in injury or damage to the employer or his property.’’

‘‘Sabotage’’ is here defined as meaning any act that results in slowing up of work, loafing on the job or withdrawal of efficiency by an employee for the purpose of causing injury or damage to the employer. Such damage or injury may be violent or nonviolent, and the petitioner has at no time maintained that ‘‘sabotage’’ did not mean slowing down on the job or striking on the job, or loitering at work or the withdrawal of efficiency, but has contended that the legislature was without power to make the advocacy of other than violent sabotage a crime, and with this contention the majority opinion is in accord, holding in effect that the kind of sabotage prohibited by statute,

must of itself be iniquitous and criminal, and therefore violent, which is directly in opposition to the law as announced in the Dingman case and as contained in the instruction above quoted and out of harmony with C. S., secs. 8580 and 8581. The court has receded from its former position and now seeks to give a narrow or technical definition of what constitutes sabotage within the meaning of C. S., secs. 8580 and 8581. Trial courts in instructing juries will find insurmountable difficulty in defining this term or just what the legislature meant by the use of the word "sabotage." What the legislature had in mind was to punish just such a conspiracy as is taught and advocated in the leaflet set out in the majority opinion, which is nothing more nor less than a conspiracy to destroy property and to overturn the government in an effort to bring about industrial or political reform by other than constitutional methods. This would be a violation of the law for which the punishment has been prescribed.

Certain judicial definitions of the word "sabotage" as given in other jurisdictions, cited by petitioner, are not in point for the reason that limitations are placed upon the word by statute in those jurisdictions. Had the legislature of this state intended to limit the meaning of the word as in those jurisdictions it would have done so, but, not having done so, we are bound by the general meaning of the term as heretofore found and as it is commonly understood. In the case of *Pike v. Jenkins,* 12 N. H. 255, the court said:

"Mr. Justice Buller remarks, in *Rex v. Inhabitants of Hodnett,* 1 D. & E. 101, that 'it is not true that courts in the exposition of penal statutes are to narrow their construction. We are to look at the words in the first instance; and when they are plain, we must decide on them; if they be doubtful, we must then have recourse to the subject matter.' And Mr. Justice Story, in *United States v. Winn,* 3 Sumner, 209, observes, 'in consulting penal statutes the proper course is to search out and to follow the true intent

of the legislature, and to adopt that sense which harmonizes best with the context, and promotes, in the fullest manner, the apparent policy and objects of the legislature.' ''

There may well be a question as to the wisdom and practical expediency of legislation so comprehensive and far-reaching as that enacted by the legislature in the criminal syndicalism statute. It is, however, the province of the legislative department to consider and decide what policy is best adapted to effectively combat an organized and widespread conspiracy against the security of citizens. If the legislature in its zeal has adopted provisions which are so harsh as to be of doubtful efficacy in meeting such a situation or susceptible of abuse by those charged with the administration of the law, the remedy is in an appeal to that body and not to the courts, which must consider such a statute with reference to any actual infringement of constitutional rights, but without passing upon the possible unwisdom or impolicy of its enactment. ''It is the exclusive province of the legislature to declare what acts, deemed by the lawmakers inimical to the public welfare, shall constitute a crime, to prohibit the same and impose appropriate penalties for a violation thereof. Judicial consideration of such enactments is limited to the inquiry whether the constitutional rights of the citizen are thereby violated or impaired.'' (*State v. Moilen,* 140 Minn. 122, 1 A. L. R. 331, 167 N. W. 345.)

There is no question in this case with regard to the lawful activities of labor organizations. ''Laborers for wages have a right to form unions for the purpose of improving their economic and social conditions. They have a right to strike in concert for a lawful purpose.'' (*Robison v. The Hotel & Restaurant Employees' Local,* 35 Ida. 418, 27 A. L. R. 642, 207 Pac. 132.) The rights of free speech and freedom of the press may unquestionably be exercised by them, but within the same legal limitations as apply to all other classes of citizens. These considerations, however, cannot have the effect of depriving the legislature of power to enact a valid statute for the protection of the citizens of

the state against such conspiracies to commit sabotage as are advocated in the published leaflet in evidence in this case, and to prescribe punishment for individuals who belong to organizations teaching and advocating such conspiracies. Such legislation is not in contravention of or repugnant to the federal or state constitutions.

It having been established that the leaflet, ''Three Kinds of Strikes,'' advocates sabotage within the meaning of C. S., secs. 8580 and 8581, and it being conceded that the leaflet is printed, published and distributed by the organization known as the Industrial Workers of the World, of which petitioner is admittedly a member, it follows that probable cause existed which justified the committing magistrate in binding petitioner over to the district court. In my opinion the writ should be denied and the petitioner held to answer.

McCarthy, C. J., concurs in dissenting opinion.

Petition for rehearing denied.

---

(January 11, 1924.)

William Healy, for Petitioner.

A. H. Conner, Attorney General, and Herman H. Taylor, for Wm. F. Dunning, Sheriff.